# THE STATE v. JAMES W. VICKERS, Appellant.

## Division Two, December 24, 1907.

1. **CHANGE OF VENUE: Discretion.** The trial of the issue of prejudice among the inhabitants of the county against defendant, upon an application for a change of venue, is to the judge of the trial court, and unless there was an abuse of the court's discretion in denying the application, the Supreme Court will not hold that it should have been granted.

2. ———: **Prejudice: Sentiment.** An answer of a witness to the effect that the sentiment of the people in his neighborhood is against the defendant should be permitted to stand.

3. ———: ———: **Fair Trial.** As an independent proposition witnesses should not be permitted to testify that ·defendant can have a fair trial in the county.

4. ———: ——·—: **Conflicting Testimony.** Where the weight of the testimony is that in the immediate neighborhood in which the crime was committed and the prosecutrix's family lived there is a strong ·sentiment against defendant and a pronounced belief in his guilt, and, on the other hand. the great weight of the testimony does not establish that any such prejudice exists in other portions of the county as would deprive the defendant of a fair trial, the trial court does not abuse its discretion in denying him a change of venue.

5. **JUROR: Opinion Formed: Newspaper Report.** A juror who on his *voir dire* testified that he "had formed or expressed no opinion as to the guilt or innocence of defendant, and knew nothing to prevent him from trying the case according to the law and the evidence," and that "he had heard his neighbors speak of the case and had read about it in the newspapers, had no bias or prejudice against defendant, that what he had read had prejudiced him against defendant, but that his impression or opinion was formed on rumor and what he had read in the newspapers, and that he never heard any witness speak about the case," was not disqualified to be accepted on the panel of forty.

6. ———: **For Trial at County Seat: Selected From Other Parts of County.** Jurors to try a criminal case in Lewis county may be selected from any part of the county. Where the case is tried at Monticello, a citizen who lives in said county east of the range line between townships 6 and 7 may be chosen as a juror. The act (Laws 1897, p. 61) which provided for the holding of

State v. Vickers.

terms of the circuit court at Canton did not curtail the jurisdiction of the court sitting at Monticello.

7. **EVIDENCE:  Conversation Over Telephone.**  A witness, though he did not know defendant, may testify what he overheard him say over the telephone, if another witness testifies that the conversation was between defendant and himself.

8. ———: **Rape: Explanation of Delay.** It was competent to permit the mother of prosecutrix to answer on her re-direct examination, by way of explanation, after a lengthy examination by defendant as to whom she had told about defendant's outrage upon her little daughter, in which she had stated she did not tell her husband for six or seven hours after the prosecutrix had told her, that she had not told her husband sooner because "the child said he", meaning defendant, "would kill papa."

9. **RAPE: Instructions: Comment on Evidence.** An instruction in the words, "The manner, the demeanor of the defendant when accused of the crime, as well as his silence under such circumstances, may be considered by you, together with all the other facts and circumstances introduced in evidence", states a correct abstract proposition of law, but is improper in being a comment on the evidence, and in assuming that defendant was silent.

10. ———: ———: **Assumption of Fact.** The instruction read: "The court instructs the jury that false statements made by the defendant when accused of the crime, about the matters which are likely to lead to his detection, may be considered by you in passing upon the guilt or innocence of the defendant." *Held*, to assume that false statements had been made by defendant, and in a close case might be very hurtful.

11. ———: ———: ———: **Affirmance Nevertheless:  Right Verdict.** But where the court in other instructions fully and cor-. rectly advised the jury as to the weight to be given to any verbal statements proven to have been made by defendant, and in a large number given for defendant presented the case to the jury in the most favorable light to him, and the evidence strongly points to his guilt, the error in giving these two instructions will not work a reversal, since the verdict is manifestly right.

Appeal from Lewis Circuit Court.—*Hon. Chas. D. Stewart*, Judge.

AFFIRMED.

*Silver & Brown* for appellant.

(1)    (a)    The court committed error to the prejudice of defendant in its rulings on the evidence offered by defendant on the trial of the question of the change of venue.    The objections of the State to the testimony of Dr. Knight, that "the sentiment was against the defendant," were improperly sustained, and the answer of the witness was erroneously stricken out.    The same is true of the testimony of the witness, Dr. Knight, that "the people were highly incensed at the time," and that there was a great deal of talk about defendant, and that the talk was unfavorable.    So the court also committed error in excluding or striking out the testimony of the witness, George Raine, to the effect that he had heard threats of lynching defendant.    State v. Burgess, 78 Mo. 236. (b)    The court also committed error in denying defendant a change of venue.    Kuenzel v. Stevens, 155 Mo. 285; State v. Goddard, 146 Mo. 183.    (2)    The trial court also committed error in overruling plaintiff's objection to J. M. Brown as a juror, and in accepting him on the panel of forty.    It is the undoubted rule of this court that a person accused of crime is entitled to a full panel of competent jurors before he can legally be called upon to make his challenges. State v. Davis, 66 Mo. 684; State v. Cullen, 82 Mo. 623; State v. Foley, 144 Mo. 600; R. S. 1899, sec. 2616. (3)    (a)    Instruction 4 is generally objectionable because the effect of it was to single out the evidence of the prosecutrix, as to defendant's demeanor, and to direct the special attention of the jurors to it, and this is true, although it was attempted to tone down the instruction with the words "with all the other facts and circumstances introduced in evidence."    "The instruction was erroneous because it was a plain comment on the evidence.    It singled out certain evidence, which was properly enough be-

fore the jury; and gave it a marked prominence. The jury were authorized to weigh these circumstances (referred to in the instructions), but it was not the duty or right of the court to thus comment on them." State v. Rutherford, 152 Mo. 133; State v. Hibler, 149 Mo. 479; State v. Sivils, 105 Mo. 531; Swink v. Anthony, 96 Mo. App. 426; R. S. 1899, sec. 2639. (b) Instruction 5 given for the State is still more vicious than 4. State v. Rutherford, 152 Mo. 124; State v. Drew, 179 Mo. 315; State v. Evans, 158 Mo. 589. The evidence does not show that defendant, when accused of the crime, made any statements, false or otherwise, about matters likely to lead to his detection. State v. Weaver, 65 Mo. 7. (4) The story of the prosecuting witness is, in substance, that the alleged rape on her person occurred at her home in daylight within the call of her mother; that defendant took off her drawers, laid her over the bed, had sexual intercourse with her for the first time, making full penetration of her person without hurting her; that she did not say "quit" or a word during the whole time; making no objections whatever to his conduct; that she suffered no pain or injury to her person; that no stains were made on her clothing or on the bed spread; that she got up and picked up her drawers, which were lying on the floor and went into the next room and put them on; that she afterwards went down stairs and went out into the garden to help her father about some matters without telling him what had occurred; that she went to the dinner table and then out in the yard to feed the turkeys and chickens and still said nothing about defendant's conduct; that she also went across the lot near the house with defendant, to look at a pony, and that later on, after her return from this latter mission, she called her mother out in the yard and informed on defendant. The foregoing story is surely a very remarkable one, contrary certainly to human exper-

ience—really incredible.    The defendant testified in
his own behalf and denied the accusation.    The evidence, taking it altogether, is insufficient to support a
conviction, and this case falls within the rulings of this
court made in the following cases: State v. Burgdorf,
53 Mo. 65; State v. Jaeger, 66 Mo. 173; State v. Primm,
98 Mo. 368; State v. Patrick, 107 Mo. 164.    But even
if we are not correct in our last contention, yet we
submit that "Where a verdict is evidently prompted by
prejudice, passion or partiality, and is not the result
of the calmer weighing of the facts in evidence, which
should always characterize the deliberations of a jury,
the Supreme Court will interfere."    State v. Prendible, 166 Mo. 353.    The quantum of punishment is an
important element in a criminal charge—most important to the accused—and where the punishment, as in
this case, of fifty years in the penitentiary (equivalent
to a life sentence) is assessed, we think the principle
last above stated, as announced by this court, applies,
and for this reason also submit that a new trial ought
to be awarded by this court.

*Herbert S. Hadley*, Attorney-General, and *N. T.
Gentry*, Assistant Attorney-General, for the State.

(1)    No error was committed by the trial court
in refusing defendant's application for a  change  of
venue from Lewis county.   True, defendant offered
several witnesses, who testified that in their judgment
there was prejudice existing in said county against
defendant; but this evidence was contradicted by a
number of witnesses for the State, who testified that
defendant could have a fair trial there.    The granting
of such an application is a matter resting in the sound
discretion of the trial judge, as this court has often
said.    State v. McCarver, 194 Mo. 734; State v. Albright, 144 Mo. 642; State v. Wilson, 85 Mo. 139; State
v. Whitten, 68 Mo. 91; 1 Bishop's New Crim. Proc.

(4 Ed.), 72. (2) The instruction on the subject of verbal admissions made by defendant has been approved by this court. State v. Darrah, 152 Mo. 522; State v. Brown, 104 Mo. 375. (3) There was certainly substantial evidence tending to show that defendant was guilty, and, when that is true, this court will not attempt to weigh the evidence, but will affirm the judgment. State v. Dilts, 191 Mo. 665; State v. Miller, 191 Mo. 587; State v. Dusenberry, 112 Mo. 293. (4) Not only was the State's evidence sufficient to submit the case to the jury, but the State's evidence made out a strong and an aggravated case against defendant. To prove conclusively that defendant committed the crime, we have simply to consider the conversation that he had over the telephone with Mr. Nelson at seven o'clock a. m., in which he wanted to know how the father of prosecutrix felt, and, on learning that he blamed defendant, defendant said to Mr. Nelson: "He ought not to, he has only heard one side of it; the guilt is on one as much as the other." When the exceedingly damaging admissions that defendant made to Mr. Nelson, Mr. Taylor and Sheriff Primrose, after his arrest, and the equally damaging admissions that he made to Mrs. Burnett and Mrs. Taylor on the afternoon of the assault are all considered, we are forced to the conclusion that his guilt was established beyond all doubt.

GANTT, J.—This is an appeal from the circuit court of Lewis county. On June 16, 1906, the prosecuting attorney of Lewis county filed an information, duly verified, charging the defendant with the rape of Reba Burnett, a female child under the age of fourteen years, at the said county of Lewis, on or about the 7th day of June, 1906.

The defendant was arrested and at the September

term, 1906, of the said court filed an application for a change of venue from said county on the ground that he could not have a fair and impartial trial for the reason that the minds of the inhabitants of said county of Lewis were prejudiced against him. This application was supported by two citizens of said county, and due notice of the same was served on the prosecuting attorney. Upon a hearing of the said application it was refused and the defendant saved his exception to the action of the court in denying him a change of venue.

At the same term the defendant was duly arraigned and entered a plea of not guilty. At an adjourned term of the said court in October, 1906, the defendant was put upon his trial and convicted and his punishment assessed at fifty years in the penitentiary. In due time he filed his motions for new trial and in arrest of judgment, and the same were overruled and exceptions duly saved and an appeal granted to this court.

The evidence on the part of the State tended to show that the prosecutrix at the time of the alleged rape was living with her father and mother on a farm near Lewiston, in Lewis county, Missouri, and was of the age of thirteen years and ten months. The defendant is a first cousin and brother-in-law of the mother of the prosecutrix. It appeared, further, that for some time prior to the date of the alleged offense the defendant had been residing in the State of Colorado, and a few days prior to the alleged offense had come to Lewis county and to the residence of the father of the prosecutrix, on the evening of June 5th, 1906, and remained all night. On the 6th he visited another relative of his in the neighborhood and returned to the Burnett home on the morning of June 7th. The State's evidence tended to show that between half past ten and eleven o'clock

in the forenoon the defendant was in the kitchen talking to the mother of the prosecutrix when the latter told the prosecutrix to go upstairs and clean up the bedrooms and move the defendant's grip from the west room into the east room, and prosecutrix went upstairs for that purpose; that the defendant followed her upstairs, and when prosecutrix came out into the hall he grabbed her by the arm and took her into the east room and asked her to go home with him, saying that his wife would return with her; that he then began to take privileges with the prosecutrix's person. He shut the door, laid her on the bed and had sexual intercourse with her against her will. The prosecutrix testified that she was so frightened that she could not scream; that she was afraid to scream, as defendant had previously stated in her presence that he was hiding from the Colorado officers and that he always carried a pistol. After being released the prosecutrix went across the hall into another room and locked the door. Defendant remained in the east room upstairs and called the prosecutrix to bring him a towel. Hearing defendant calling for a towel, the mother of prosecutrix walked up the stairs, a part of the way, and pitched a towel to defendant. During this time there was no one upstairs except the defendant and the prosecutrix, and the mother of prosecutrix was the only other person in the house. After the defendant went down stairs prosecutrix followed and aided her mother to get dinner. She ate dinner with the balance of the family. After dinner prosecutrix called her mother into the yard and there made a complaint against the defendant. The mother then telephoned her sister, Mrs. Taylor, to come over, and in a short time Mrs. Taylor and Mrs. Nelson, a sister-in-law, came to the residence of the prosecutrix and her parents. Shortly after the arrival of these ladies the mother and Mrs.

Taylor went out into the yard with prosecutrix, when the mother told Mrs. Taylor what had occurred. Seeing the three together out in the yard, the defendant came out to them and asked if they were plotting against the whites, whereupon the mother said: "Jimmie, I would not have had this happen for anything in the world. Reba has told me everything." Defendant turned white, seemed nervous and said he had done nothing, whereupon prosecutrix confronted him and accused him in the presence of the other two. Defendant then asked if her father knew it, and said that what he did would not hurt her any, and asked her mother not to let this go any further. Seeing that the women out in the yard were excited, the father of prosecutrix, who had been reading in the house, came out and desired to know what was the matter. Defendant left the women, walked up to Mr. Burnett and told him that they had had a discussion about who was the mother of prosecutrix, which it seems had been the cause of some previous misunderstanding between the members of that family. The mother testified she did not tell her husband of this assault till after the defendant had left their home that afternoon, because she was afraid. After defendant had gone to the home of Mr. Nelson, a mile or two distant, to stay all night, the prosecutrix and her mother told the father. Defendant retired for the night at the Nelson home, but left some time very early the next morning without telling any of the family he was going, and walked to the town of Tolona, which is on the railroad some three or four miles distant. When defendant reached Tolona, he called Mr. Nelson over the telephone and talked with him about seven o'clock in the morning; and this conversation was overheard by Joseph Ragan. Defendant asked Nelson if Burnett had been to Nelson's house, and if he was mad; and Nelson replied that

he was right smart out of humor, and he blamed defendant. Defendant said: "He ought not to, as be has heard only one side of it; the guilt is on one as much as the other." Defendant then asked about getting a saddle horse from Charley to ride over to George's. Two ladies testified to seeing the defendant about six o'clock that morning, walking along the track going towards Tolona, and noticed that he was traveling very rapidly and looking back often. He especially looked toward the wagon road near the railroad track that comes in the direction of the Burnett home. Little after seven o'clock defendant went to the boarding house of Mrs. Dance in Tolona and got breakfast. He told Mrs. Dance that he was in the business of enlarging pictures and taking orders for a firm in St. Louis; that his samples would be along the next day, and he would show her some of his work. The regular passenger train going east at that time passed Tolona between eight and nine o'clock in the forenoon. Between eight and nine o'clock that day defendant was arrested at Tolona by the sheriff of Lewis county.

On the Sunday following his arrest defendant sent for Mr. Nelson to come to the jail to see him. Nelson went and the defendant told him he would like to have Mr. and Mrs. Burnett come and see him; he wanted to talk with them; that if they would look at it right they would let him out; that the girl was equally guilty with him; that she had consented to it; that he would pay the expenses of sending her off to school, and her mother could go along with her; that he was willing for his stallion to stand good for the expenses; that the girl had not been injured. He further stated that he knew he was guilty, but his passions got the best of him; that if the girl's parents came in they could get the case dismissed. In a second conversation he said the girl came and sat

on his lap and he could not control his passions. The testimony tended to show that there were three other witnesses present who heard these conversations with Mr. Nelson.

The defendant testified in his own behalf and denied having had intercourse with the prosecutrix. He detailed at great length his troubles and lawsuits in Colorado, and that in view of his trouble there he concluded that it was best for him to get out of that State and go to New York. He stated that he traveled under an assumed name, that of J. W. Camp, but earnestly denied that there was anything criminal in his conduct in Colorado. He stated that he came to Lewis county for the purpose of having a settlement with his relatives in regard to a lot of stock and horses which he had shipped there, but that a satisfactory settlement had not been made. He admitted, however, that the father of the prosecutrix did not owe him anything. He denied the conversation attributed to him by the State's witnesses.

Defendant introduced several physicians who testified that in their opinion, if defendant had sexual intercourse with a girl the size of the prosecutrix, she could not have been so badly frightened that she could not scream, and that there would have been evidence of stain upon her garments if intercourse had occurred.

I.   One of the chief grounds of error relied upon by defendant is the refusal of the circuit court to grant him a change of venue from Lewis county. There was much evidence on this issue, both for the defendant and the State.

Among other witnesses, Doctor Z. Knight, on behalf of the defendant, testified that he had lived in the northern portion of Lewis county for twenty years. He did not know defendant, but knew his wife. He had heard of the charge against the defendant, and

nearly everybody in that neighborhood talked with reference to this charge. Asked to state the purport of the conversations he had heard in reference to defendant's guilt or innocence, he answered: "The sentiment was against the man." On motion of the State this answer was stricken out, and defendant excepted. He was then asked to state what was said, and answered that "the people were highly incensed at the time; that is the only way I can answer, the sentiment was against him." This answer also was stricken out, and defendant excepted. He was asked whether the talk was favorable or unfavorable, and an objection to this question was sustained. Subsequently this witness was permitted to state that his neighbors said "defendant was a bad man and came in from the West to this country and was a member of a gang of desperadoes and a great deal of stuff along that line; that was the talk at that time." On cross-examination, over the objections and exceptions of the defendant, the witness was permitted to state he had heard no one say he would not give the defendant a fair and impartial trial.

George Raine testified he was the constable of Monticello township; that he was acquainted in different portions of the county, and had since he heard of the charge against the defendant mingled with the citizens of the township and county; had heard the case discussed; "heard it talked over a great deal;" heard lots of men say if they were on the jury they believed they would hang him, if it was proved that he was guilty; that most of the men witness talked to believed he was guilty. Witness was asked if he had not heard from reputable men that a mob was organized to take defendant out of jail and punish him, to which inquiry the State objected and the objection was sustained and exception saved. The witness further stated there was a great deal of feeling and excitement

in the part of the county where this matter occurred. He was asked if there were not threats of lynching made, and answered that he heard there were. Objections were sustained to these answers.

G. H. Primrose testified he was the sheriff of the county; that parties stated to him that there was strong talk of a mob; that word came to him to that effect two or three times, perhaps more than that; that witness was informed that a party of about twenty men had started to the county-seat; that twelve or fifteen came, but said they did not come for violence; that one could not attend to the jail without help, and the sheriff ought to have help; that when he heard these rumors he went to the jail and put defendant in the northwest corner cell and secured it for his protection; that the crowd came to the jail and witness refused to talk to them all and agreed to talk to one or two of them; that Glaze and Beckley were appointed to confer with witness; that these people came on Sunday morning.

Thomas Beckley testified that he heard it said that defendant had committed the crime; that there had been much carrying on; that it ought to be stopped; and also that defendant had a bad reputation.

J. G. Wentzell testified that he had heard some persons in a general way say that defendant was a bad character; that he heard some one say that defendant had murdered his wife.

J. E. Throckmorton testified that he heard somebody say that defendant came from somewhere in the West and had been accused of some crime there, shooting some fellow; that if guilty, he should be punished, imprisoned or hanged; that witness lived in the extreme western part of the county and did not hear the matter discussed very often.

C. V. Primrose testified that he was deputy sheriff; that a few persons talked to him about defendant; that

one or two said he was a desperado, several said he was a mean man and ought to be watched; that he had shot a fellow; that he had heard some persons say he ought to be hung.

A. W. Shouse testified he remembered the time the charge was made against the defendant in this case; that he conversed with a great many citizens of Lewis county from different points of the county in reference to defendant and the crime with which he was charged; that they said he was a bad man; that he had been in trouble out West, and some of them said he should be hung on general principles; that the case was pretty generally discussed all along the line, down in Canton, on the streets, in the stores and in the post office; that no one said anything good about the defendant.

P. M. Graves testified that he heard it said about the time defendant was arrested that he had shot a man in Colorado and there was a reward of $500 for him. This was said up about Lewiston. He also heard it said that if defendant was guilty he ought to be mobbed, and this case was discussed in connection with another case that had previously occurred.

Halsey White testified that he had talked with some citizens of the county and they said defendant was a bad man and had killed two men out West.

The State on its part introduced a number of witnesses. These witnesses came from different sections of the county and testified to having heard of the charge; that they were well acquainted in their respective townships; and that they had heard the case discussed very little, if at all, and generally the parties discussing it would say that if the defendant was guilty he ought to be punished. They had seen a mention of it in the newspapers, but the papers had made very little impression upon them, as they did not understand that the papers undertook to state the facts,

but simply what they had heard. Among others, were stockmen, physicians, bank clerks and other business men with wide acquaintance in the county. Several of these witnesses for the State did testify that they had heard that the defendant was a fugitive from justice from Colorado.

After a careful examination of all this evidence on both sides we think that the weight of the evidence was that in the immediate neighborhood of Lewiston, near which the father of the prosecutrix lived, there was a strong sentiment against the defendant and belief in his guilt; but the great weight of the testimony as to the other portions of the county did not establish any such a prejudice as would prevent the defendant from having a fair trial in that county, and much of the testimony tended to establish that whatever opinions were expressed in regard to the defendant were conditional upon his having been proven guilty of the offense. We are of the opinion that the court should have permitted the answers of Doctor Knight, to the effect that the sentiment in his neighborhood in Lewis county was against defendant, to stand; but when the witness was finally permitted to answer that his neighbors said that he was a bad man and came in from the West to this country and was a member of a gang of desperadoes, and a great deal of stuff along that line, we think the defendant had the full benefit of all that this witness knew on the subject. We also think that the court, as an independent proposition, should not have permitted the witnesses to testify that the defendant could have a fair trial in Lewis county. This form of examination was condemned by this court in State v. Burgess, 78 Mo. 234. But in this case this evidence was only elicited after the witnesses had stated all their knowledge of the case and of the sentiment of the people in their respective neighborhoods.

The trial of an issue of this character is to the judge of the court; and unless manifest error occur on the trial of that issue, this court is bound by the finding of the circuit court.  The granting of such an application is a matter resting largely in the sound discretion of the trial judge; and in view of our previous rulings we are unable to say that there was any abuse of the discretion in overruling the application in this case.  [State v. McCarver, 194 Mo. l. c. 734; State v. Albright, 144 Mo. l. c. 642.]

II.  It is next insisted that the trial court erred in overruling defendant's objection to J. M. Brown as a juror and accepting him on a panel of forty.  The juror on his *voir dire* testified that he had no acquaintance with the defendant, was not related to any of the witnesses, had formed or expressed no opinion as to his guilt or innocence and knew nothing to prevent him from trying the case according to the law and the evidence if he was selected as one of the jurors.  He testified that he had heard his neighbors speak of the case and had read about it in the newspapers, had no bias or prejudice against the defendant, that what he had read had prejudiced him against the defendant, but that his impression or opinion was formed on rumor and what he had read in the newspapers; he had never heard any witness speak about the case.

Section 2616, Revised Statutes 1899, provides: "It shall be a good cause of challenge to a juror if he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn."

Taking the whole examination of this juror together we think it is apparent that whatever opinion he had was based entirely upon rumor and news-

paper reports, that he had no bias or prejudice against the defendant, and that he was a competent juror. In State v. Sykes, 191 Mo. l. c. 76, *et seq.,* this question was carefully reviewed by this court and the rulings in State v. Bryant, 93 Mo. 273, State v. Williamson, 106 Mo. 162, and State v. Cunningham, 100 Mo. 382, were adhered to. In that case the language of Judge BLACK, in State v. Cunningham was approved, wherein he says: "Moreover, the question as to the qualification of the juror must be determined, not from a few catch-words drawn from him by a series of questions, but from his whole examination, including his demeanor whilst on the witness stand. When he says he would have a prejudice and bias which it would take evidence to remove, and the defendant would have to prove his innocence, he is evidently speaking of the case on the supposition that the circumstances as stated in the newspaper reports should turn out to be true. His attention is called to the newspaper account, his opinion thereon, and then the direct and leading questions are asked which bring out the statements. When he is given an opportunity to make a full explanation, it appears he has no bias at all. He understood it to be his duty to disregard the newspaper reports, and this he says he could and would do. His notions of the case were nothing more than such as any one would form from reading a newspaper report, and it is but common information that such reports have little or no influence upon a fair-minded man when he is called upon to determine the fact in the light of evidence given under oath. If such a juror is to be rejected it must be because he is an intelligent, honest, fair-minded man, and not because he has any opinion which would in the least sway his mind from an impartial consideration of the evidence."

III. It is also objected that the circuit court erred in accepting on the panel of forty as competent jurors residents of Canton and Union townships, in Lewis county. The record discloses that Canton and Union townships in Lewis county lie east of the range line between ranges 6 and 7 in said county, and that the jurors Chas. M. Maze, N. D. Starr and C. M. Little lived in one or the other of Canton and Union townships. The question as to the competency of these jurors arises under the act of the General Assembly, approved March 5th, 1897, establishing the terms of the Lewis Circuit Court at Canton, in said county. [Laws 1897, p. 61.] This act was before this court for consideration in State v. Hall, 189 Mo. 262. By the first section of that act it is provided "that the judge of the First Judicial Circuit shall hold two terms of the Lewis County Circuit Court each year in the town of Canton, in said county of Lewis, at the following times, to-wit, on the third Monday in March and the third Monday in September." The information in the present case was filed in the office of the clerk of the circuit court at Monticello, the county seat of said county, and was tried in said city. In State v. Hall the information was filed in the office of the circuit clerk at Canton; and the contention in that case was that the circuit court in the Canton division of the court had no jurisdiction of the case because the information did not charge the offense to have been committed within the territorial division of the court. But we held that the circuit court sitting at Canton was possessed of all the powers and jurisdiction conferred by law upon it when it held its sessions at Monticello; that it was not the purpose of the Legislature by that act to establish a new court, but simply to provide for the holding of a regular term of the circuit court at a place different from the county seat; and that the grant of jurisdiction in section 3 of the said act was

a work of supererogation, which adds nothing what-ever to the jurisdiction of the circuit court, nor in any manner curtails its jurisdiction. The decision in State v. Hall, 189 Mo. 262, was reaffirmed in State v. Sub-lett, 191 Mo. 163. The question in this case as to these jurors is, we think, much narrower than that presented in Hall's case. Here it is conceded that the offense was committed in Lewis county and not in the Canton district, and the only proposition advanced is that it was incompetent for the circuit court in trying this cause at the regular county seat at Monti-cello to use jurors who resided in the Canton town-ship or from that part of the county lying east of the range line between ranges 6 and 7. We think the point is not well taken. The circuit court at Mont-icello had jurisdiction co-ordinate with the county, and there is nothing in the act providing for a term of the circuit court at Canton which restricts the power of the circuit court at Monticello to send its *venire* in any part of the county for the selection of jurors for service in that court.

IV. Error is predicated upon the action of the court in permitting the witness Joseph Ragan to tes-tify on behalf of the State to a conversation he heard passing over the telephone between John Nelson and another person, on the ground that such evidence could only be competent against the defendant on the ground that he was the person talking to Nelson. Ragan testified that about seven o'clock on the morn-ing of June 8th he overheard a telephone conversa-tion between John Nelson and another man; that he recognized Nelson's voice, but not the voice of the other man; that Nelson said that Burnett was mad, blamed the defendant, and the other man said Burnett only heard one side, etc. When Nel-son took the stand he testified that at the same hour

that morning he talked to the defendant over this telephone line, recognized defendant's voice and knew it was the defendant that was talking to him.

The order in which testimony is admitted is a matter largely resting in the discretion of a trial court. Obviously it is no objection to a witness's testimony that he cannot testify to all the facts in a case by himself.    Taken in connection with Nelson's testimony identifying defendant as the other party to the conversation with him on the morning of the eighth, we think it was clearly competent.    [Wolfe v. Railroad, 97 Mo. 481, 482.]    Of course, if Nelson had not identified the defendant as the other party to his conversation on that morning over the telephone, it would have amounted to nothing.

It is also assigned as error that the court permitted Mrs. Burnett to state that she delayed telling her husband because "the child said he [meaning defendant] will kill papa." This statement was made in answer to a question propounded on the re-direct examination by the counsel for the State, after the defendant, at great length and with great particularity, had examined Mrs. Burnett as to the parties to whom she had stated the complaint of the prosecutrix and her conversations with the defendant in regard to his action, and she had stated that she did not tell her husband until about dusk that evening; and the State simply asked her to give her reason for her delay in not telling her husband sooner.    We think it was perfectly competent for her to give this explanation. But this alleged error is not ground for reversal, anyway, for the reason that the only objection to it was that it was incompetent and immaterial.

V.    Among other instructions for the State, the court gave the following:

"4.    The manner, the demeanor of the defendant

when accused of the crime, as well as his silence under such circumstances, may be considered by you, together with all the other facts and circumstances introduced in the evidence.

"5. The court instructs the jury that false statements made by the defendant when accused of the crime, about the matters which are likely to lead to his detection, may be considered by you in passing upon the guilt or innocence of the defendant."

These two instructions for the State are challenged by the defendant on the ground that they assume, in the fourth, that the defendant was silent when accused of the crime for which he was being tried, and for the further reason that it singles out the evidence of the prosecutrix as to the defendant's demeanor; and the fifth is assailed also on the ground that it assumed that the defendant had made false statements and did not restrict the false statements even to matters of evidence.

We have no hesitancy in saying that in our opinion these two instructions were unnecessary. The court had already, in the third instruction for the State, fully advised the jury as to the weight to be given to any verbal statements that were proven to have been made by the defendant; and in the tenth instruction given for the defendant had further elaborated that subject. Obviously the substance of these two instructions was taken from the text of some lawbook on evidence. The fourth in substance states a correct abstract proposition of law, but is open to the criticism in this case that it trenches upon the rule which forbids the court to comment upon the evidence. The fifth is so general and indefinite that it could not have been any guide to the jury, but its chief vice is in the assumption that false statements had been made by defendant. Neither of them should have been given; but the serious question which confronts us is,

conceding that they are open to the criticism made by counsel for defendant, ought the case to be reversed for this error alone? All the other instructions given on the part of the State and the defendant are free of any substantial error; and those for the defendant, some seventeen in number, presented the case to the jury in the most favorable light for the defendant.

Were it a close case, we can see how such instructions, particularly the fifth, might be very hurtful and we would not hesitate to reverse the judgment—we do not approve them because we think the court should not have assumed the facts stated in them; but after an examination of both these instructions in the light of the evidence we cannot bring ourselves to the conclusion that they had any appreciable effect upon the jury. The issue was a plain and simple one; and on the question of statements and admissions of defendant the court told the jury in the tenth instruction for the defendant ''that in considering the statements and admissions testified to by the different witnesses they should take into consideration the time and place when such admissions and statements were made, the circumstances surrounding the defendant at the time, his condition, his relationship, if any, to said witnesses, the manner and mode of making the same, the time elapsing between the time of making such statements and the time of the trial, the feeling of the witnesses towards defendant, the memory of the witnesses with reference to the same and all of the facts and circumstances surrounding such witness and the defendant at the time of making the same.'' And in the fourteenth instruction for the defendant the jury were told ''that extra-judicial confessions, or those which are made out of court, are not sufficient to convict those who make them, unless they are corroborated

by other evidence and the crime be proven to have been committed by other evidence.''

When it is considered that there was absolutely no evidence tending to show any motive for the prosecutrix making a false charge against the defendant, and that she was corroborated by her mother as to the presence of the defendant in the room at the time she testified the assault was made, and the defendant's flight from the Nelson home in the early morn of the next day, without any reason therefor, and his statements to Mrs. Dance at the breakfast table in Tolona to the effect that he was traveling for a St. Louis picture enlarging company, a statement which is not pretended to have been true, and his conversation with Mr. Nelson at seven o'clock that morning in which he desired to know how the father of the prosecutrix felt towards him, and on learning that the father was incensed, saying to Mr. Nelson that the father ''ought not to blame him as he had only heard one side of it and the guilt was on one as much as the other,'' and his statements at the jail to Mr. Nelson, in the presence of Taylor and another Mr. Nelson and the sheriff, in which he fully admits his commission of the crime and sought to extenuate his conduct by pleading the want of control of his passions, and his damaging admissions to the mother and Mrs. Taylor on the afternoon of the day on which the offense was perpetrated, it would seem there is little doubt of the defendant's guilt. It has often been ruled by this court that where the verdict is manifestly for the right party, errors in the giving or refusing of instructions will not work a reversal. [State v. McClure, 25 Mo. 338; State v. Moore, 61 Mo. 276; State v. Miller, 111 Mo. 542; State v. Privitt, 175 Mo. l. c. 230; State v. Taylor, 134 Mo. l. c. 152.]

We have carefully considered all the other assignments of error urged in the oral argument and in the

brief of the counsel for defendant, and in our opinion they present no ground for a reversal of the judgment. And, accordingly, it must be affirmed.

*Fox, P. J.*, and *Burgess, J.*, concur.