STATE of Missouri,
Plaintiff-Respondent,

v.

Ronald B. MAY, Defendant-Appellant.

No. 39640.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 7, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 17, 1979.

332

Richard Fredman, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Jefferson City, George A. Peach, Circuit Atty., Richard G. Callahan, St. Louis, for plaintiff-respondent.

STEWART, Judge.

A jury convicted defendant of manslaughter in the death of Ernest Whitfield. He was sentenced by the court to ten years

imprisonment under The Second Offender Act § 556.280 RSMo 1969.

On this appeal defendant contends that (1) the evidence was insufficient to submit the cause to the jury; (2) the court erred in permitting a State's witness to testify to threats made to her because the threats were not linked to defendant; (3) the court erred in refusing to permit defendant to call a witness in surrebuttal; and (4) in refusing to give an instruction on self-defense.

■ The first issue requires an extensive statement of the facts. In determining the sufficiency of the evidence we review the evidence, direct and circumstantial, in the light most favorable to the State including all favorable inferences that can be drawn from that evidence and ignore all evidence and inferences to the contrary. *State v. Miceli*, 549 S.W.2d 113 (Mo.App.1977).

Ernest Whitfield, and his wife Juanita, lived at 4422 Maffitt, apartment 19 in the City of St. Louis. Their daughter Wanda and her infant daughter lived in apartment 15 which was close to her parents' apartment.[1] The walls in the apartments were thin. Sounds in Wanda's apartment could be heard by her parents if they were in the bathroom or the kitchen. As we read the testimony one enters the apartments by the kitchen. The apartments 19 and 15 are on the first floor. The front doors open from the kitchen onto an outside courtyard.

Mr. Whitfield's son, Michael, who was similar in appearance to his father, lived in an apartment on Newstead Avenue just around the corner from his parents. Michael had permitted a person named J. J. to sell narcotics out of his apartment. Houston Pridgett had been living with Wanda and was making sales of narcotics from her apartment.

About a month before Mr. Whitfield was killed Michael Whitfield was stopped on the street by defendant and his nephew Gary Mayes (sic). Defendant told Michael " 'Get them niggers out of your house before I come up there and blow everybody out of there, and you can go tell your sister to get them niggers out of their house.' " Three days before the shooting defendant "paid a visit" to Pridgett at Wanda's apartment and in Wanda's presence told Pridgett "You can't sell no drugs around here." Pridgett told defendant that he would sell drugs wherever he wanted. Wanda told defendant that he wouldn't have to come to her house to look for Pridgett because Pridgett would not be staying there. Later Wanda asked Pridgett to leave her house and he did.

On December 16, 1976 between 8:30 and 9:00 PM Wanda's sister, Hortense, and Wanda's infant daughter were leaving Wanda's apartment when defendant along with Steve Moore, Gary Mayes, James Scott and a fifth person, whom Wanda said she did not know, approached the apartment. Moore entered the apartment and asked Wanda how she was doing. Moore then started out the door as defendant was about to enter. Moore told defendant " 'Ain't nothing happening, man. Ain't nothing happening.' " Defendant then pushed Hortense back into the house and "bogarded"[2] his way into the apartment. He was followed by the unknown male. There is some indication that this person was Jimmy Sharp, one of defendant's "lieutenants". All three were armed. Gary Mayes and James Scott stayed outside the door.

Defendant asked Wanda where Pridgett was and where the guns were. When she told him she didn't know he pushed her in the closet and started kicking her in the abdomen. He was slapping her as he told her she was lying; that she knew where Pridgett was and told her to find the guns. Hortense started screaming during the scene. Defendant took Wanda into the liv-

---

1. Where in relation to her parents is not clear and we are handicapped because none of the exhibits including photographs have been filed with the court. Wanda testified:

"Q. Right next door? A. Next door. Q. Two doors down, one door—there's one place in between. A. Yes, one door down."

2. The witness explained the term as "acting like a tough guy."

ing room and made her take the couch apart to show there was nothing in it. At this time two shots were fired outside the door. The three men who were in the apartment ran out the door and after they got outside about ten more shots were heard. After the shooting stopped Wanda looked out the door and saw her father lying on the ground and the five men running away.

Defendant, Steve Moore and Jimmy Sharp were next seen as they ran into defendant's pool hall on Newstead Avenue at the alley between Maffitt and St. Louis Avenues. Defendant and Steve Moore had pistols that they put in a drawer under the cash register. Defendant told Sharp to have everyone leave and to close up the pool hall. Defendant, Moore and Sharp then got into a car and drove east on St. Louis Avenue.

Mr. Whitfield, before being found outside had been in his apartment. He was watching television in the living room-bedroom portion of the apartment while his wife was lying in bed. He left the room for the kitchen or bathroom, an area where sounds from the adjoining apartment can be easily heard.

The victim suffered multiple shotgun wounds of the right side of the body with through-and-through wounds of the right arm, a fracture of the right humerus and penetrating wound of the right chest which entered into the medius sternum and then caused a large wound of the anterior wall of the heart. The primary cause of death was a large destructive wound in which the front of the left and the right side of the heart was essentially blown away. It was the opinion of the medical examiner that the latter injury was caused by a shotgun blast.

There was a bullet hole found in the door of the victim's apartment. It had entered the door from the outside. A cabinet in the kitchen was dented by a projectile. Seven shotgun shells were found at the scene, two were live and five had been fired. A reading of the transcript without the aid of the photographs used at the trial does not give a clear picture of the location of the evidence seen and found during the investigation of the crime.

Defendant argues that the evidence "failed to link [defendant] or any of his co-defendants with a shotgun and failed to establish that [defendant] was acting in concert with anyone who sought to cause the death of deceased."

■ It is not necessary to show defendant's participation in the crime by direct evidence nor is the State required to prove that defendant personally committed the acts constituting all of the essential elements of the crime in those cases where one aids and abets in the commission of a crime. *State v. Dodson*, 556 S.W.2d 938, 950 (Mo. App.1977). Proof of the commission of a crime may be by way of circumstantial evidence provided the facts and circumstances are consistent with each other and with the hypothesis of defendant's guilt. They must also be inconsistent with and exclude every reasonable hypothesis of his innocence. The circumstances do not have to be absolutely conclusive of guilt nor do they have to demonstrate the impossibility of innocence. The existence of other possible hypotheses is not sufficient to remove the case from the jury. *State v. Miceli*, 549 S.W.2d 113 (Mo.App.1977). While flight is a circumstance to be considered against an accused in connection with other evidence, presence and flight alone are insufficient to sustain a conviction. *State v. Mason*, 506 S.W.2d 458 (Mo.App.1974).

■ In the case at bar we do not have mere presence of the defendant at the scene. Defendant, accompanied by his nephew Gary, had made threats to Michael Whitfield concerning persons selling drugs from Michael's apartment and told him to tell Wanda to get Pridgett out of her apartment. Defendant also went to Wanda's apartment and ordered Pridgett out. On the night of the crime defendant came to Wanda's apartment to get Pridgett and guns that he thought were in the apartment. The jury could readily find that he was accompanied by the four other persons

who were with him. The fact that they were armed indicated that they would shoot anyone who would interfere with them. See *State v. Adams*, 98 S.W.2d 632, 636 (Mo.1936). Two of the men with defendant including Gary, who was with him when he threatened Michael, remained outside when defendant "Bogarded" his way into the apartment. These men gave all the appearances of protectors or bodyguards of defendant. It was about the time defendant was assaulting Wanda and when Hortense was screaming that the first two shots were fired. The jury could find that Mr. Whitfield heard the sounds in his daughter's apartment and went to investigate. When the shots were fired defendant went outside. After he was outside ten more shots were fired. After the shooting ceased defendant and the others were seen running from the scene. No other persons were seen in the vicinity of the crime. Defendant was next seen at his pool hall with Moore and Sharp when he and Moore concealed weapons under the cash register and defendant ordered the pool hall closed. The primary cause of Mr. Whitfield's death was shotgun wounds. There was, however, evidence that other weapons had been used because of the through-and-through wounds and the fracture of the arm; a total of about twelve shots were fired and only five spent shotgun shells were found. There is sufficient evidence of a circumstantial nature to warrant submission of the cause to the jury as to defendant's connection with the other persons present. In fact, all of the facts indicate that defendant was in command of the group. The fact that the shotgun was not found and that there were no eye-witnesses to the discharge of the shotgun is of no consequence when we consider that there were no other persons in the immediate vicinity of the crime. *State v. Dodson, supra.*

■ While presence and flight alone may not be sufficient, the conduct of a defendant before and after an offense are circumstances from which defendant's participa-tion may be inferred. *State v. Nickelson*, 546 S.W.2d 539 (Mo.App.1977).

■ To support his contention that the court should have directed a verdict of acquittal, the defendant also argues that "the physical evidence was inconsistent with the hypothesis of [defendant's] guilt." As pointed out above we do not have the advantage of the exhibits particularly the photographs and the diagram from which one of the witnesses testified. The trial court had the exhibits and the black board demonstration before it as explanatory of the oral testimony which is not clear absent the exhibits. We must assume that the trial court did not err in this regard. *First Bank & Trust Company v. Montgomery*, 570 S.W.2d 346 (Mo.App.1978).

Defendant next contends that the court erred in permitting witness Wanda Whitfield to testify on redirect examination concerning threats communicated to her because the threats were not linked to the defendant.

Wanda Whitfield was the State's principal witness. On cross-examination she was severely impeached by the use of a tape recorded statement that she had given to defendant's attorney about a month before the trial. On redirect examination she was asked why she gave the statement to defendant's attorney. She testified that there had been numerous threats and that her mother's car had been firebombed. Cecil, a friend of defendant and also a friend of Wanda, told her "you watch yourself because I've been hearing things and you watch yourself closely because they got indicted." He also asked her if she was "going to court on" defendant. She was threatened on several occasions. In order to protect herself she told the persons who conveyed the threats that she did not testify before the grand jury.

Some time later Cecil called her saying he wanted her to talk to defendant's lawyer and that Barbara wanted to talk to her. Barbara was described as defendant's "wife, girl friend." Cecil picked her up and they met Barbara outside the lawyer's of-

fice and Barbara told her what to say. She then gave the statement to the lawyer.[3]

Wanda further testified that she did not know the origin of the threats. It is conceded that defendant was confined during the time she received the threats. She stated that the reason she gave the statement to the defendant's lawyer was because of the threats.

In order to avoid the effect of cross-examination a witness may be asked his reasons for acts or conduct on his part, or for inconsistent statements that have been brought out on cross-examination. *State v. Griffin,* 497 S.W.2d 133 (Mo.1973). See also *State v. Vickers,* 209 Mo. 12, 106 S.W. 999 (1907). The scope and extent of the explanation for the conduct or inconsistent statements is a matter within the discretion of the trial court and we may reverse only upon a finding of abuse of that discretion. *State v. Charles,* 525 S.W.2d 360, 363 (Mo.App.1975).

In the case at bar the defendant developed the evidence of the inconsistent statements made by the witness. The witness had a right to explain on redirect examination that the reason for her inconsistent statements was fear generated by threats.

Defendant's reliance on *State v. Hicks,* 535 S.W.2d 308 (Mo.App.1976) is misplaced. In *Hicks* the State in its opening statement advised the jury that it would show that one of its witnesses had been threatened. The witness testified on direct examination that she had received threatening telephone calls. The court there held that when evidence of threats made to induce a witness to destroy, suppress or fabricate evidence are introduced in the State's case in chief to establish defendant's guilt and show consciousness of guilt, it must be shown that the threats were made by the defendant or by a third person at defendant's urging or with defendant's knowledge and consent. *State v. Hicks* at page 311.

The fact that defendant could not be linked to the threats, did not eradicate fear as the motive for the witness' inconsistent statements. The purpose of the testimony was not to show a consciousness of guilt but to explain the matters brought out on cross-examination.

We find no abuse of discretion on the part of the trial court in admitting the evidence of threats made to Wanda Whitfield.

Defendant next asserts that the trial court erred in refusing to permit him to call the public defender as a surrebuttal witness. The situation giving rise to this contention had its origin in the testimony of an attorney for Gary Mayes, a co-defendant. The attorney testified that he met Wanda Whitfield in one of the court rooms on June 1 about three weeks before the present case was tried. Gary Mayes' mother introduced Wanda to him. Wanda told him that she said that she had told the police that "I had seèn Gary there that night but I didn't see him there that night." It was his recollection that Wanda's mother was with her at the time. On rebuttal Mrs. Whitfield testified that she was not with her daughter in the presence of the lawyer on June 1. In response to further questions she testified that she went to the Circuit Attorney's office with Wanda on the Saturday before the trial and that the Assistant Circuit Attorney did not put any pressure on Wanda to testify.

Defendant then made an offer to prove by way of testimony of the Public Defender that during the second day of the trial the Public Defender conferred with Wanda Whitfield and that she expressed a desire not to testify; that the attorney for the State informed her that if she did not testify he would have to dismiss the charges. She then stated that she would testify.

The control of rebuttal or surrebuttal testimony is a matter within the sound discretion of the trial court and his rulings

---

3. There is absolutely no indication that counsel was aware of the matters leading to the giving of the statement.

will not be disturbed except for abuse of that discretion. *State v. Huff*, 454 S.W.2d 920 (Mo.1970).

Here the evidence offered would not rebut the testimony as to what transpired on the Saturday before the trial and sought to inject a collateral issue of no relevancy to the cause. Defendant suffered no prejudice, there was no abuse of discretion.

For his final point defendant charges that the trial court erred in not giving his requested instruction on self-defense. Defendant leads us to no evidence of record and our reading of the transcript reveals no evidence that would warrant the giving of an instruction on self-defense. This contention has no merit. *State v. Baker*, 277 S.W.2d 627, 629 (Mo.1955).

Finding no error the judgment of the trial court is affirmed.

STEPHAN, P. J., and KELLY, J., concur.