STATE OF CONNECTICUT *v.* SHAWN L. ROBINSON
(14408)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and SANTANIELLO, JS.

712

Argued June 3—decision released September 7, 1993

*Neal Cone,* assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom, on the brief, was *Patricia A. Swords,* state's attorney, for the appellee (state).

CALLAHAN, J. This appeal concerns multiple issues arising out of the criminal trial of the defendant, Shawn Robinson. The state charged the defendant in a substitute two part information. The first part charged the defendant with two counts of assault in the first degree in violation of General Statutes (Rev. to 1989) § 53a-59 (a) (1) and (3),[1] assault in the second degree in violation of General Statutes § 53a-60 (a) (5),[2] rioting at a correctional institution in violation of General Statutes § 53a-179b,[3] and

---

[1] General Statutes (Rev. to 1989) § 53a-59 provides in pertinent part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person . . . ."

[2] General Statutes § 53a-60 provides in pertinent part: "(a) A person is guilty of assault in the second degree when . . . (5) he is in the custody of the commissioner of correction, confined in any institution or facility of the department of correction, or is a parolee from a correctional institution and with intent to cause physical injury to an employee of the department of correction or an employee or member of the board of parole, he causes physical injury to such employee or member."

[3] "[General Statutes] Sec. 53a-179b. RIOTING AT CORRECTIONAL INSTITUTION: CLASS B FELONY. (a) A person is guilty of rioting at a correctional

possession of a weapon or dangerous instrument in a correctional institution in violation of General Statutes § 53a-174a.[4] The second part charged the defendant with being a persistent serious felony offender pursuant to General Statutes § 53a-40 (b).[5] He was found guilty by a jury of assault in the second degree, rioting at a correctional institution and possession of a weapon or dangerous instrument in a correctional institution. He was also convicted of being a persistent serious felony offender. He was sentenced as a persistent serious felony offender to a term of imprisonment of ten years on the assault count, twenty-five years on the rioting count, and ten years on the possession of a weapon count, all sentences to run consecutively, for a total effective sentence of forty-five years imprisonment. Thereafter, he appealed from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).[6] We affirm the judgment of the trial court.

institution when he incites, instigates, organizes, connives at, causes, aids, abets, assists or takes part in any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations of such institution.

"(b) Rioting at a correctional institution is a class B felony."

[4] "[General Statutes] Sec. 53a-174a. POSSESSION OF WEAPON OR DANGEROUS INSTRUMENT IN CORRECTIONAL INSTITUTION: CLASS B FELONY. (a) A person is guilty of possession of a weapon or dangerous instrument in a correctional institution when, being an inmate of such institution, he knowingly makes, conveys from place to place or has in his possession or under his control any firearm, weapon, dangerous instrument, explosive, or any other substance or thing designed to kill, injure or disable.

"(b) Possession of a weapon or dangerous instrument in a correctional institution is a class B felony."

[5] General Statutes § 53a-40 (b) provides in relevant part: "A persistent serious felony offender is a person who (1) stands convicted of a felony, and (2) has been, prior to the commission of the present felony, convicted of and imprisoned under an imposed term of more than one year or of death, in this state or in any other state or in a federal correctional institution, for a crime. This section shall not apply where the present conviction is for a crime enumerated in subdivision (1) of subsection (a) of this section and the prior conviction was for a crime other than those enumerated in subsection (a) of this section."

[6] General Statutes § 51-199 (b) (3) provides: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal

A review of the transcript of the defendant's trial reveals the following. On April 19, 1990, at approximately 8:30 p.m., the defendant attended a gathering of seventy-five to one hundred inmates in the east mess hall of the Connecticut Correctional Institution at Somers in honor of the Islamic religious feast, Ramadan. The gathering turned into a riot when an inmate verbally confronted and then placed his hands on the Imam, a religious leader. Inmates began to shout, climb on tables, fight, and throw trays. Thirty-five correction officers responded in an attempt to restore order. During the incident, the defendant, while situated at the center of the group of rioting inmates, slashed correction officer David Serkosky on the right side of his neck with a sharp metal instrument. The defendant then put the instrument into a paper bag, and walked away from the crowd and toward the east wall of the mess hall.

Four correction officers gave testimony relevant to the defendant's involvement in the crimes with which he was charged. Officer Ronnie King testified that from a distance of approximately five feet he had seen the defendant walk around Serkosky and with his right hand cut Serkosky in the neck. He then saw the defendant put a shiny metal object into a paper bag and then step against a wall. King testified that the incident had occurred quickly. Serkosky testified that he had been cut while standing in the center of the group of inmates who had been involved in the disturbance. Serkosky did not see who slashed him, nor did he see the defendant at any time during the incident. Officer Christopher Conniff testified that while breaking up a fight between several inmates, he saw the defendant moving away from the group of inmates toward a wall of the mess

action involving a conviction for a capital felony, class A felony, or other felony, *including any persistent offender status,* for which the maximum sentence which may be imposed exceeds twenty years." (Emphasis added.)

hall. Conniff testified that from approximately forty feet away he saw the defendant holding a dark object the size of a roll of dimes in the palm of his right hand. Finally, officer John Springer, a dog handler, testified that, after Serkosky and two other officers had been injured, he had entered the mess hall with his dog. Once within the mess hall, Springer saw the defendant walking toward him in the forefront of a group of inmates. As the group approached, Springer put the dog into an attack mode. He heard the defendant and others repeatedly yelling: "Get [the dog] out of here. Let's get that dog out of here. Let's kill Springer and his dog."

On appeal, the defendant claims that the trial court improperly: (1) rejected his challenge to the jury array because he had failed to establish that the under-representation of African-Americans on the jury panel was due to systematic exclusion; (2) failed to make an adequately detailed inquiry into his complaints about his attorney; (3) admitted evidence of verbal threats made by him against correction officers as evidence of consciousness of guilt; (4) permitted the state to introduce evidence of sentences imposed on his prior convictions; (5) permitted the state to introduce a prison disciplinary ticket to establish that he had possessed a weapon on an earlier occasion; (6) instructed the jury that an assault on a correction officer could also constitute rioting; (7) refused to disclose the contents of the personnel records of the correction officers who testified against him; (8) permitted certain closing arguments of the codefendant and the state that were unduly prejudicial; and (9) committed, as a result of the cumulative effect of the above noted improprieties, harmful error. We affirm the judgment of the trial court.

I

The defendant first claims that the trial court improperly rejected his challenge to the jury array because

he had failed to establish that the underrepresentation of African-Americans on the jury panel was due to systematic exclusion. Consequently, the defendant argues that he was deprived of his constitutional right to have a jury drawn and selected from a fair cross section of the community as guaranteed by article first, §§ 8 and 19, of the Connecticut constitution.[7]

"The American tradition of trial by jury . . . necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946); *Holland* v. *Illinois,* 493 U.S. 474, 480, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990); *Taylor* v. *Louisiana,* 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *State* v. *Tillman,* 220 Conn. 487, 492, 600 A.2d 738 (1991), cert. denied, U.S. , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). This fair cross section requirement mandates that the jury wheels, pools of names, the panels and venires from which juries are drawn must not systematically exclude distinctive groups in the community. *Taylor* v. *Louisiana,* supra, 530.

At trial, the defendant relied on the sixth amendment and the equal protection clause of the fourteenth amendment to the federal constitution. Under federal constitutional law, the leading basis for a constitutional challenge under the sixth amendment to the composition of a jury array is that set forth in *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), wherein the United States Supreme Court stated: "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant

---

[7] The constitution of Connecticut, article first, § 8, provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury."

Article first, § 19, of the Connecticut constitution provides: "The right of trial by jury shall remain inviolate."

must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." See also *State* v. *Tillman,* supra; *State* v. *McCarthy,* 197 Conn. 247, 250, 496 A.2d 513 (1985); *State* v. *Castonguay,* 194 Conn. 416, 421–22, 481 A.2d 56 (1984). Under the *Duren* test, "[o]nce the defendant has established this prima facie case, the burden then shifts to the state to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest." *State* v. *Castonguay,* supra, 422.[8]

At trial, during the first day of jury selection, David Kritzman, counsel for the codefendant,[9] joined by counsel for the defendant, moved to dismiss the first panel of twelve prospective jurors, arguing that the absence of any African-Americans on the panel denied the defendants their rights under the sixth amendment and fourteenth amendment to have a jury composed of a fair cross section of the Tolland County community.

[8] "[I]n fair cross section claim [under the sixth amendment], the defendant need not prove intent. '[S]ystematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement.' *Duren* v. *Missouri,* [439 U.S. 357, 368 n.26, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)]; id., 371, (Rehnquist, J., dissenting); *United States* v. *Perez-Hernandez,* 672 F.2d 1380, 1384 n.5 (11th Cir. 1982); *Villafane* v. *Manson,* 504 F. Sup. 78, 82 n.6 (D. Conn.), aff'd without opinion, 639 F.2d 770 (2d Cir. 1981)." *State* v. *Castonguay,* 194 Conn. 416, 421, 481 A.2d 56 (1984).

[9] At trial, counsel for the codefendant made most of the arguments in challenging the jury panels as lacking a fair cross section of the community. Because the defendant had joined the codefendant in these challenges, for the purposes of this appeal we will refer to the challenger of jury panels as "the defendant."

It was represented to the trial court that the 1990 census indicated that out of a total population of 128,699 persons in Tolland county, 2625 or approximately 2 percent were African-American. The state argued that under our decision in *State* v. *Castonguay,* supra, the defendant had the burden of demonstrating that African-Americans had been systematically excluded from the jury panel. The state maintained that the defendant had failed to do so because he had not presented statistics indicative of the exclusion of African-Americans over a substantial period of time.[10] The court denied the defendant's motion.

After another venire panel without an African-American had been brought into the courtroom, the defendant renewed his motion to dismiss. He argued that the burden at this point should shift to the state to explain the lack of a single African-American on the two panels that had been drawn. The court responded to the defendant's concerns by noting that, because there was a very small minority population in Tolland County, the fact that none of the twenty-four venirepersons was black did not indicate that African-Americans had been systematically excluded from the jury array. Consequently, the trial court concluded that the burden had not yet shifted to the state to show that there was not systematic exclusion.

Two days later, after another panel had been drawn and a total of thirty-three prospective jurors had been observed, the defendant again noted that an African-American had yet to appear on any of the panels. The

[10] At several points during trial, and in the defendant's brief, however, the defendant noted that the jury panels also did not contain any Hispanics. Because the primary basis of the defendant's challenge is that the jury panels did not contain any African-Americans, and that this absence was prejudicial to the defendant because he is an African-American, we will focus solely on the constitutional significance to be attached to the absence of any African-Americans on the jury panels.

defendant claimed that at that point there should have been a rebuttable presumption that there had been a systematic exclusion of minorities and that it was now the state's burden to show that no such systematic exclusion had occurred. The state again denied having such a burden, arguing that the defendant was required to demonstrate, by way of statistical analysis tracking data over a substantial period of time, that African-Americans had been systematically excluded from jury arrays in Tolland County. The court agreed with the state and concluded that it was premature for it to speculate as to whether there had been any systematic exclusion.

The next day, after forty-six prospective jurors had been brought into court, the defendant renewed his claim that African-Americans had been systematically excluded from the panels. The court denied the motion, noting that the number of prospective jurors had not yet reached the level at which the court could draw any valid inference that systematic exclusion had taken place. After sixty jurors had been called without an African-American being among them, the defendant again moved to dismiss the panel, arguing that African-Americans were being systematically excluded from the jury array. The trial court denied the defendant's motion.

The defendant has abandoned his federal constitutional claim on appeal. Instead, he predicates his right to have a jury drawn from a representative cross section of the community on the Connecticut constitution, article first, §§ 8 and 19. He argues that, although the *Duren* test applies, and remains substantively unaltered under the Connecticut constitution, our constitution mandates, as a matter of procedure, that once the defendant has satisfied the first two parts of the *Duren* test, the state has the burden of demonstrating, under

the third part of *Duren,* that any underrepresentation of a distinctive group is not the result of systematic exclusion.

The defendant claims, moreover, that we should abandon the use of the substantial impact test because it validates discrimination against small and medium sized minority groups. We decline the defendant's invitation, however, to venture into the whole arcane area of statistical modeling because, even if we were to concede that the second part of the *Duren* test had been met, we still would not, in this case, reach the defendant's state constitutional claim that the burden of demonstrating systematic exclusion, the third part of the *Duren* test, should have shifted to the state. The defendant's state constitutional claim is unsupported by any independent analysis of §§ 8 and 19 of article first of the state constitution, the provisions relied upon to advance his claim. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. See, e.g., *State* v. *Crafts,* 226 Conn. 237, 243 n.3, 627 A.2d 877 (1993); *State* v. *Blades,* 225 Conn. 609, 614 n.4, 626 A.2d 273 (1993); *State* v. *Reddick,* 224 Conn. 445, 463 n.22, 619 A.2d 453 (1993); *State* v. *Santiago,* 224 Conn. 325, 328 n.4, 618 A.2d 32 (1992); *State* v. *Campbell,* 224 Conn. 168, 181 n.10, 617 A.2d 889 (1992); *State* v. *Stanley,* 223 Conn. 674, 689, 613 A.2d 788 (1992); *State* v. *Cerilli,* 222 Conn. 556, 572 n.11, 610 A.2d 1130 (1992); *State* v. *Kyles,* 221 Conn. 643, 657 n.9, 607 A.2d 355 (1992); *State* v. *Negron,* 221 Conn. 315, 321 n.7, 603 A.2d 1138 (1992); *State* v. *Pinnock,* 220 Conn. 765, 776 n.3, 601 A.2d 521 (1992). Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim that, once underrepresentation

has been shown, the state constitution mandates that the burden shifts to the state to prove the absence of systematic exclusion.

## II

The defendant next claims that the trial court failed to make an adequate inquiry into his complaints about his attorney. We disagree. At trial, the defendant had a number of disputes with his attorney, Brian Karpe, and on several occasions made known to the court that he did not want Karpe to continue to represent him.[11] While the jury was being selected, the defendant moved to "fire" Karpe. The defendant explained that he and Karpe had disagreed over certain things "in the General Statutes and the Practice Book dealing with my case." Karpe told the court that he and the defendant had had disagreements "on some trial tactics." In response, the trial court explained to the defendant that his counsel had control over trial strategy and tactics. The trial court further remarked that "from what I have seen of Mr. Karpe's representation, I see nothing that would cause me to fire him and replace him with another attorney."[12] The defendant then complained that Karpe had not come to prison to consult with him about the case. He also stated that he wished to file a motion that some of the state's remarks to the prospective jurors were biased. In response, Karpe moved to withdraw due to the defendant's expressions of dissatisfaction with his services. The court denied Karpe's motion, explaining that there was no reason, especially at that point in the trial with the jury being

[11] Karpe had been appointed as the defendant's attorney approximately nine months before trial, and had filed several pretrial motions on the defendant's behalf.

[12] The record reveals that the defendant's counsel had appropriately filed several pretrial motions on his behalf, such as a motion to sever trials, a motion for transfer of prosecution, a motion for sequestration, a motion for advance disclosure of witness' statements, and motions in limine.

selected, to remove him from the case. The defendant, however, commented that he felt that Karpe had no desire to try his case. The court reminded the defendant that, despite his persistent protests, it had denied his motion to dismiss Karpe. The court then proceeded with jury selection.

Two days later, just as court convened, Karpe again moved to withdraw from the case because the defendant had informed him that he did not believe that Karpe was prepared. Karpe represented that the defendant had stated that he believed that he could have questioned the prospective jurors more effectively than Karpe, and that the defendant had "made allegations that I'm trying to railroad him." Karpe also stated that he believed that the attorney-client relationship had broken down and that he should be excused from further representation of the defendant. The court informed the defendant that, if he was dissatisfied with Karpe's representation, he had a right to represent himself, if he wished to do so. The defendant responded that he did not wish to represent himself. He said he only desired "good representation," and complained that Karpe had failed to obtain items he had previously requested, such as exact copies of disciplinary reports, medical records, and all of the incident reports pertaining to the events of April 19, 1990. Karpe told the court that the state had given him access to the incident reports and that he had dictated these and provided the defendant with copies of transcribed versions.[13] The trial court then stated that it was treating the dialogue among itself, the defendant and Karpe as a motion to replace Karpe with new counsel. It then denied the motion.

The next day, during jury selection, Karpe again moved to withdraw because the defendant refused to

[13] On May 24, 1991, the defendant again complained that he had not yet received exact copies of certain incident reports.

speak with him. The trial court denied the motion. The defendant then turned and faced the rear of the courtroom during the voir dire of prospective jurors, claiming that he had no voice in the questions that were being asked of the jurors. Later, after the jury had been selected, at the outset of the state's presentation of evidence, Karpe again moved to withdraw. He told the trial court that the defendant had threatened that if Karpe was trying to "railroad" him, he "would certainly stop it." The trial court denied the motion and explained to the defendant that Karpe was acting in his best interests and that it would be to his advantage to cooperate with his counsel. Karpe then told the court that the defendant had indicated to him that he would prefer to represent himself. The court asked the defendant if he wished to proceed pro se. The defendant did not respond, and the court interpreted his silence as indicating that he did not wish to do so.

After the defense had rested, the defendant became agitated. He stated that he wanted to fire Karpe "because I ain't resting nothing yet." He told the court that he wished to call other witnesses and to return to the witness stand. The court told the defendant that it could not honor his requests. The defendant then left the courtroom with Karpe. Karpe returned to the courtroom shortly thereafter and apologized for his client's behavior. The court then asked Karpe whether he had spoken with his client after they left the courtroom together. Karpe responded that he had, and explained to the court that the defendant was upset and had elected to absent himself from the trial. The defendant did not attend the trial for the rest of that day, but did appear for closing arguments on the following day.[14]

[14] After the defendant's counsel had presented closing argument, the defendant objected to Karpe's failure to use the entire allotted hour. The defendant then requested that the court allow the defendant to address the jury. The trial court refused the defendant's request, explaining to him

" 'Where a defendant voices a "seemingly substantial complaint about counsel," the court should inquire into the reasons for dissatisfaction.' *McKee* v. *Harris,* [649 F.2d 927, 933 (2d Cir. 1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982)], quoting *United States* v. *Calabro,* 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S. Ct. 1358, 35 L. Ed. 2d 587, reh. denied, 411 U.S. 941, 93 S. Ct. 1891, 36 L. Ed. 2d 404 (1973)." *State* v. *Gonzalez,* 205 Conn. 673, 685, 535 A.2d 345 (1987). If "[t]he defendant's eruptions at trial, however, fell short of a 'seemingly substantial complaint,' " we have held that the trial court need not "inquire into the reasons underlying the defendant's dissatisfaction with his attorney." Id., 685. The extent of an inquiry into a complaint concerning defense counsel lies within the discretion of the trial court. Cf. *State* v. *Drakeford,* 202 Conn. 75, 83, 519 A.2d 1194 (1987). Moreover, the defendant's right to be represented by counsel "does not grant a defendant an ' "unlimited opportunity to obtain alternate counsel" ' on the eve of trial; [id.]"; *State* v. *Gonzalez,* supra, 683; and "may not be used to achieve delay" in the absence of " 'exceptional circumstances.' " *State* v. *Drakeford,* supra, 83, 84. The appellate scrutiny of the trial court's inquiry into complaints concerning adequacy of counsel must be tempered by the timing of such complaints.

The defendant claims that, although he had attempted to explain to the court that he had misgivings about Karpe's representation, the trial court failed adequately to look into, and on numerous occasions gave short shrift to, his apprehensions. We disagree.

that it was the role of counsel to give the closing arguments, which had already been completed. In light of what the defendant had said to the court, Karpe then requested an opportunity to address the jury again. The court denied Karpe's request.

Preliminarily, we note that we look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial, or during the trial itself. "A defendant has no 'unbridled right to discharge counsel *on the eve of trial.* . . . In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances.' (Emphasis in original.) *United States* v. *Grow,* 394 F.2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S. Ct. 118, 21 L. Ed. 2d 111 (1968)." *State* v. *Drakeford,* supra, 83–84. Here, the defendant's grievances concerning counsel were made during trial. Despite that and despite the fact that these complaints were not "seemingly substantial," or did not appear to constitute "exceptional circumstances," the record reveals that the trial court permitted the defendant an opportunity fully to inform the court of his grievances, treated them as important and took appropriate action where necessary or possible.

Although we believe that a trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel, "a trial judge's failure to inquire [into the defendant's request for new counsel where the defendant has already made known the reasons for his request] is not reversible error." *McKee* v. *Harris,* supra, 933; *Brown* v. *United States,* 264 F.2d 363, 369 (D.C. Cir. 1959) (Burger, J., concurring in part). In this case, the trial court, having been informed of the nature of the defendant's complaints and having ruled on his motion to dismiss counsel, was not thereafter required continually to halt the trial and to inquire further into the defendant's incessant complaints over his attorney's performance unless they were different and seemingly substantial. *State* v. *Gonzalez,* supra, 683–85. Most of the defendant's complaints, however, concerned matters of trial strategy. "Differences of opinion over trial strategy are not unknown," however, "and do not

necessarily compel the appointment of new counsel." *State* v. *Drakeford,* supra, 83. Moreover, the defendant's contention that the trial court virtually ignored his complaints is contrary to what is revealed by the record. Even though the trial court did not continually inquire into the defendant's complaints, it also did not close the line of communication with the defendant and allowed him to make frequent pro se motions to which it gave adequate consideration. Viewing the entire record, we regard the trial court's tolerance of the defendant's complaints concerning his counsel as evincing a high degree of judicial solicitude toward the defendant's concerns.

The defendant, nonetheless, argues that even after it must have been obvious to the court that a serious breakdown in the attorney-client relationship had occurred, the trial court made only a cursory inquiry into the cause of the breakdown. The defendant asserts that a more detailed inquiry was required of the trial court because his right to the effective assistance of counsel implies the right to the active protection of the trial court to preserve that right when such a breakdown occurs. We disagree.

Although we have held that in some circumstances a complete breakdown in communication between client and counsel may require the appointment of new counsel; see *State* v. *Gethers,* 193 Conn. 526, 543, 480 A.2d 435 (1984); we do not believe that this is such a case. Despite the defendant's repeated attempts to thwart his counsel's efforts to represent him, it appears that the attorney-client relationship endured. Throughout the trial, the defendant's counsel still managed to articulate the defendant's concerns and make motions that the defendant himself had requested that he make. Furthermore, "[a] defendant is not 'entitled to demand a reassignment of counsel simply on the basis of a "breakdown in communication" which he himself induced.'

*McKee* v. *Harris, supra, 932." State* v. *Gethers, supra,* 545; *State* v. *Drakeford, supra,* 84. Whatever breakdown occurred in the attorney-client privilege in this case was largely the result of the defendant's own actions and threats.

We cannot say that the trial court failed to make adequate inquiry into the defendant's complaints concerning his counsel's performance.

### III

The defendant next claims that the trial court improperly admitted evidence of certain verbal threats made by the defendant against correction officers as evidence of consciousness of guilt. The defendant specifically argues that the trial court failed to require the state to lay a proper foundation for the admission of such evidence. Moreover, the defendant argues that even if a proper foundation had been laid, the trial court failed to weigh the probative value of the evidence against its prejudicial effect. We disagree.

The defendant made no claim at trial that the question of the admissibility of evidence of consciousness of guilt was of constitutional magnitude. He, nonetheless, claims on appeal that the admission of this evidence deprived him of a fair trial under the fourteenth amendment to the federal constitution and under article first, § 8, of the Connecticut constitution.[15] He accordingly seeks to prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).

The defendant's claim arose in the following context. At trial, four correction officers—Ronnie King, Christopher Conniff, David Serkosky and John Springer—testified to the defendant's involvement in

---

[15] The fourteenth amendment to the United States constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty or property, without due process of law."

the riot. The state asked King whether the defendant had said anything to him since the incident. King answered that the defendant had made "a couple of little threats." The defendant objected to this testimony, arguing that it was irrelevant because the defendant had not been charged with threatening. In response, the state argued that King's testimony concerning the defendant's threats was admissible as tending to establish consciousness of guilt. The trial court agreed and overruled the defendant's objection. King then testified that the defendant had, on two occasions since the riot, said that "he was going to get me."

During the examination of Conniff, the state asked him if he had seen the defendant on the night of the incident. Conniff testified that while he was responding to an alarm in the segregation block, he had seen the defendant. Conniff was then asked if he had heard the defendant say anything on that occasion. The defendant objected on hearsay grounds. The state countered by arguing that Conniff's testimony as to what the defendant had said was admissible to demonstrate consciousness of guilt. The trial court excused the jury and, in its offer of proof, the state asserted that Conniff was going to testify that the defendant had said that "he was going to 'kill one of you motherfuckers,' meaning the [correction officers] and then 'I'll have to go to the electric chair.' " The defendant argued that his statements were not indicative of consciousness of guilt, but only that he was upset shortly after the prison riot. The court overruled the defendant's objection on the ground that his statements had relevance to his consciousness of guilt. The court thereafter permitted the state to elicit from Conniff the testimony that he had heard the defendant threaten other correction officers shortly after the incident.

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by

him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act." (Internal quotation marks omitted.) *State* v. *Joly,* 219 Conn. 234, 250, 593 A.2d 96 (1991); *State* v. *Reid,* 193 Conn. 646, 655, 480 A.2d 463 (1984). Threats that are made against witnesses have been regarded by this court as evidence of consciousness of guilt. *State* v. *Leecan,* 198 Conn. 517, 534, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); *State* v. *Maturo,* 188 Conn. 591, 597–98, 452 A.2d 642 (1982).

"The general rule is that threats against witnesses are not relevant and are thus inadmissible as evidence *unless* the defendant is linked in some way to the making of the threats. *State* v. *Altrui,* [188 Conn. 161, 174, 448 A.2d 837 (1982)]; *State* v. *Brokaw,* 181 Conn. 475, 478–79, 436 A.2d 6 (1980); *State* v. *Sorbo,* 174 Conn. 253, 256, 386 A.2d 221 (1978); *State* v. *May,* 587 S.W.2d 331, 336 (Mo. App. 1979); *Commonwealth* v. *Bryant,* 316 Pa. Super. 46, 50, 462 A.2d 785 (1983); *State* v. *Payano,* 528 A.2d 721, 728 (R.I. 1987); 1 F. Wharton, Criminal Evidence (14th Ed. Torcia) § 145; C. McCormick, Evidence (3d Ed.) § 273." (Emphasis added.) *State* v. *Walker,* 214 Conn. 122, 129, 571 A.2d 686 (1990). Moreover, if evidence of threats that indicate consciousness of guilt is sought to be admitted, "[b]efore [such] evidence is allowed to be given . . . the court must also consider whether its prejudicial tendency outweighs its probative value." *State* v. *Reid,* supra, 655–56; *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982).

Obviously, the threats, about which correction officers King and Conniff testified, were linked to the defendant because King and Conniff testified that the defendant was the one who had made them and the defendant has not claimed otherwise. Moreover, the transcript reveals that the state had established an ade-

quate foundation for relating these threats to the crimes with which the defendant was charged. During the state's direct examination, King testified that he had witnessed the defendant cut Serkosky and that afterward he had seen the defendant being escorted out of the mess hall. King was specifically asked, "[W]hat if anything, sir, has he said to you with respect to *this incident*?" (Emphasis added.) King responded that the defendant had, on two occasions since, said to him that "he was going to get me." King's response arguably connected the defendant's threats, directed as they were at him, with the incident of April 19, 1990. Likewise, the state had adequately laid a foundation for the admission of Conniff's testimony concerning the defendant's threats to other correction officers. Conniff had told the court that he had heard the defendant threaten other correction officers on the night of the incident shortly after the stabbing. The jury could easily have inferred that those threats, although generalized, were related to the incident out of which the defendant's criminal charges arose, which included several counts of assaulting correction officers and one count of rioting at a correctional facility.

The defendant argues, however, that even if a foundation had been laid for the admission of his threats, the trial court failed to perform a balancing test to gauge whether the disputed statements were more prejudicial than probative. We disagree. The fact that the trial court did not utter the talismanic words that the evidence was "more probative than prejudicial" does not indicate that it did not make such a determination. Moreover, the defendant never objected at trial that the evidence was inadmissible because it was more prejudicial than probative. The trial court, therefore, did not have occasion to articulate such a determination. We can infer from our review of the transcript, however, that the trial court properly determined that

the probative value of the defendant's out-of-court threats outweighed their prejudicial effect. *State* v. *Cooper,* 227 Conn. 417, 630 A.2d 1043 (1993).

The fact that the evidence of the threats made by the defendant was damaging to his position at trial should not be confused with unfair prejudice. "All adverse evidence is damaging to one's case, but it is inadmissible only if it creates 'undue' prejudice so that it threatens an injustice were it to be admitted." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. Sup. 1992) § 8.1.3, pp. 87–88. "Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." *State* v. *DeMatteo,* 186 Conn. 696, 703, 443 A.2d 915 (1982). The evidence of these threats was not extraneous to the issue at trial and did not inject confusing or time consuming issues into the proceedings, nor did they provoke an undue emotional response. *State* v. *Holliman,* 214 Conn. 38, 51, 570 A.2d 680 (1990). King testified that such threats are commonplace in the prison context. Having been informed of that fact, the jury was unlikely to have been unduly incited after having heard the testimony concerning the threats.

In summary, we conclude that the trial court did not abuse its discretion when it ruled that evidence of the defendant's threats was admissible. "The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." *State* v. *Boles,* 223 Conn. 535, 549, 613 A.2d 770 (1992). Moreover, because we believe that the question of the admission of the defendant's threats was an evidentiary rather than a constitutional issue, we conclude that there was no constitutional violation that would permit the defendant to prevail on his unpreserved constitutional claim under *Golding.*

## IV

The defendant next claims that the trial court improperly permitted the state to introduce evidence of sentences imposed on some of his prior convictions that had been admitted only to impeach his credibility. He specifically argues that, because the jury was apprised of the length of the sentences imposed, he was unduly prejudiced. Consequently, he alleges that the admission of evidence of the length of the sentences constituted reversible error. We disagree.

At trial, the state filed a motion to permit it to present evidence of the defendant's prior convictions for impeachment purposes if he chose to testify. The trial court ruled that, if the defendant chose to testify, the state would be entitled to use, for impeachment purposes, his 1987 convictions of three counts of robbery in the first degree and one count of attempted robbery in the first degree, and his 1987 conviction for escape from custody. Nonetheless, against his attorney's advice, the defendant chose to testify. During the cross-examination, the state asked the defendant if he was an inmate at Somers Correctional Institution. The defendant answered that he was. The state then asked the defendant if he was the same Shawn Robinson who had been convicted of robbery in the first degree on September 4, 1987, in New Haven Superior Court. The defendant responded, "That's my name but I was never convicted." The state then inquired about the two other convictions for robbery in the first degree in 1987. The defendant responded, "I wasn't convicted for nothing. I wasn't convicted. You're saying convicted, took a trial and so forth." The state responded, "No, I'm saying convicted and sentenced to a total effective sentence that appears to be [15] years suspended after service of 10 years."

The codefendant's counsel, David Kritzman, then objected, saying that he did not believe that the state was permitted to mention a particular sentence when introducing someone's prior conviction. The court overruled the objection. The state then asked the defendant about the four robbery convictions in 1987. The defendant responded, "I was never convicted, I don't understand." The state asserted that because the defendant had denied these prior convictions, it was permitted to introduce certified copies of the judgments. The court agreed. Thereafter, the defendant argued that the length of the sentences indicated on the certified copies was irrelevant and prejudicial.[16] The court overruled his objection. The defendant then admitted, in response to a question by the state, that he had also been convicted for escape from custody in 1987 and for two unspecified felonies in 1991. The state did not attempt to introduce the certified copies of those judgments. Subsequently, the trial court instructed the jury to use the evidence of the defendant's prior convictions for impeachment purposes only, and not as evidence of guilt of the charged offenses.

Although it is well settled that a court may admit evidence of a witness' prior felony convictions for the purposes of impeachment so long as their prejudicial effect does not "far outweigh" their probative value; *State v. Harrell,* 199 Conn. 255, 260–61, 506 A.2d 1041 (1986); *State v. Nardini,* 187 Conn. 513, 521, 447 A.2d 396 (1982);[17] this court has yet to decide whether it is

[16] The defendant also objected to the admission of the certified copies of the convictions because he could read, through the back page of the copies, charges that had been nolled pursuant to a plea agreement. The trial court was therefore presented with a redacted photocopy that omitted the dismissed charges.

[17] In *State v. Nardini,* 187 Conn. 513, 522, 447 A.2d 396 (1982), we articulated the specific test for balancing the probative value of evidence concerning prior convictions against the prejudicial effect of its admission such that a trial court must consider three factors: "(1) the extent of the preju-

permissible to allow reference to the sentences resulting from such prior convictions. We have, however, condoned the practice of proving prior convictions with a certified copy of the judgment; *State* v. *Denby,* 198 Conn. 23, 29–30, 501 A.2d 1206 (1985), cert. denied, 475 U.S. 1097, 106 S. Ct. 1497, 89 L. Ed. 2d 898 (1986); *State* v. *English,* 132 Conn. 573, 581, 46 A.2d 121 (1946); although we have not heretofore defined the scope of admissible factual material contained in such judgments.

The courts in the majority of state jurisdictions that have addressed this issue have allowed the sentence accompanying a witness' conviction to be admitted if that conviction is introduced to impeach the defendant. See, e.g., *Gafford* v. *State,* 440 P.2d 405, 413 (Alaska 1968), cert. denied, 393 U.S. 1120, 89 S. Ct. 996, 22 L. Ed. 2d 125 (1969); *Foster* v. *State,* 304 Md. 439, 499 A.2d 1236 (1985), cert. denied, 478 U.S. 1010, 106 S. Ct. 3310, 92 L. Ed. 2d 723 (1986); *State* v. *Washington,* 383 S.W.2d 518 (Mo. 1964); *State* v. *Sinclair,* 57 N.J. 56, 269 A.2d 161 (1970); *State* v. *Finch,* 293 N.C. 132, 235 S.E.2d 819 (1977); *State* v. *Johnson,* 231 N.W.2d 180, 184–85 (N.D. 1975); *Webb* v. *State,* 445 P.2d 531 (Okla. Crim. App. 1968); *Jackson* v. *State,* 161 Tex. Crim. 561, 279 S.W.2d 354 (1955); *State* v. *Sayward,* 66 Wash. 2d 698, 404 P.2d 783 (1965). Other states have held that evidence of the sentence for a conviction admitted for impeachment purposes should not be allowed. See, e.g., *People* v. *Rappuhn,* 390 Mich. 266,

dice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time."

General Statutes § 52-145 also provides: "CERTAIN WITNESSES NOT DISQUALIFIED. CREDIBILITY. (a) A person shall not be disqualified as a witness in any action because of, (1) his interest in the outcome of the action as a party or otherwise, (2) his disbelief in the existence of a supreme being, or (3) his conviction of crime.

"(b) A person's interest in the outcome of the action or his conviction of crime may be shown for the purpose of affecting his credibility."

212 N.W.2d 205 (1973); *Murray* v. *State,* 266 So. 2d 139 (Miss. 1972), cert. denied, 411 U.S. 907, 93 S. Ct. 1534, 36 L. Ed. 2d 196 (1973); *State* v. *Corn,* 215 S.C. 166, 54 S.E.2d 559 (1949).

In *State* v. *McClain,* 23 Conn. App. 83, 87, 579 A.2d 564 (1990), the Appellate Court adopted a rule endorsed by a third group of jurisdictions. This rule prohibits the admission of a witness' sentence for a prior conviction *if* he has admitted the fact of that conviction. Id.; see, e.g., *People* v. *Chestnut,* 42 App. Div. 2d 594, 345 N.Y.S.2d 79 (1973); *State* v. *Corn,* supra. We see no reason in this case to reconsider the Appellate Court's resolution of that issue. We conclude that in circumstances where, as here, the witness denies the fact of his prior convictions, it is permissible to inquire into basic factual identifying circumstances surrounding the prior convictions that appear in the certified copy of the judgment, such as the title of the offense, the date and time of conviction, and the sentence imposed. Such information, if denied by a witness, may further reflect on the witness' credibility or it may enable a witness, who has denied awareness of the prior conviction because of a lapse of memory, to recall the prior conviction and thereby to rehabilitate himself. See *Gafford* v. *State,* supra; *State* v. *Washington,* supra; *State* v. *Sinclair,* supra.

The defendant in this case contends that he was confused over the meaning of the word "conviction" and, consequently, did not really deny the existence of the prior convictions at issue. He argues, therefore, that the trial court improperly admitted evidence concerning the sentences he had received for his prior convictions for the three counts of robbery in the first degree and the count of attempted robbery. We disagree. If, in fact, the defendant was confused when asked about his prior convictions, it was appropriate for the court to permit the state to ask the defendant whether he

could recall having received a certain sentence for such prior convictions in an effort to refresh his recollection. The sentence indisputably is a salient identifying feature of the prior conviction that would no doubt assist a witness' faulty memory to recollect the conviction concerning which inquiry had been made.

Moreover, even if we were to conclude that the defendant is correct in his contention that he did not deny his prior convictions, because his claim does not involve a violation of a constitutional right, he has the burden of demonstrating that the introduction of the sentences corresponding to his prior convictions was prejudicial. Cf. *State* v. *Talton,* 197 Conn. 280, 290, 497 A.2d 35 (1985). In *McClain,* the Appellate Court concluded that the jury's knowledge of the defendant's twelve year conviction for a total of twelve robberies and two unspecified felonies would be likely regarded as "relatively light" and therefore did not prejudice the defendant.[18] *State* v. *McClain,* supra, 89.

In this case, there were several factors that would likely have led the jury to give minimal weight to the

---

[18] The defendant claims that the harm caused in this case by the admission of the defendant's sentence for the prior convictions of robbery and attempted robbery are unlike the harm caused in *State* v. *McClain,* 23 Conn. App. 83, 579 A.2d 564 (1990), because in this case the defendant did not reveal his prior convictions on direct examination. Consequently, the defendant argues that he "had already been hurt more than the usual defendant" because he was unable to avoid the appearance of attempting to hide his prior convictions, and the state was able to gain added advantage by being able to reveal his bad acts. The defendant fails to mention, however, that his counsel had expressly gone on record to notify the court that he had instructed the defendant that it would be a mistake to testify for the likely reason that the defendant would be examined concerning his prior convictions. We reject the defendant's argument that, because he was placed in a strategically untoward position, the error resulting from the admission of the sentence for some of his prior convictions was more than harmless. Moreover, we reject the defendant's contention that the state sought to introduce character evidence. The evidence concerning the prior convictions was to be used strictly for impeaching the credibility of the defendant.

fact that the defendant had received a fifteen year sentence for three counts of robbery in the first degree and one count of attempted robbery. The jury was obviously aware that the defendant was incarcerated as an inmate in Somers Correctional Institution. It is highly unlikely therefore that the jury was shocked to learn that the defendant was serving a fifteen year sentence. Further, after the state had introduced the defendant's prior convictions for the three counts of robbery and one count of attempted robbery, and the fifteen year accompanying sentence, the state properly impeached the defendant further by having him admit that he had three additional prior convictions. The state, however, did not seek to introduce the sentences accompanying those convictions. Consequently, viewing the sum of the evidence that was available to the jury concerning his prior convictions, we cannot conclude that it is more probable than not that the admission of the defendant's fifteen year sentence for the three counts of first degree robbery and attempted robbery was likely to have unduly prejudiced or incensed the jury so as to result in an unfair trial. Therefore, any impropriety in admitting the evidence of the length of the defendant's sentences was harmless.

## V

The defendant next claims that the trial court improperly permitted the state to introduce a prison disciplinary ticket in order to impeach his testimony that he had never possessed a weapon in prison. This claim has two aspects: first, the defendant argues that the admission of the disciplinary ticket improperly impeached him on a collateral matter by extrinsic evidence; and second, he claims that the evidence was admitted improperly because it was, in essence, propensity or bad character evidence. We disagree.

During the defendant's direct testimony, he stated that he had not possessed any type of weapon or dangerous instrument on the night of the incident. When the state cross-examined the defendant concerning his possession of a weapon, the defendant asserted repeatedly that he had never possessed a "shank" at any time, nor did he have knowledge of how such weapons were made. The state then addressed other matters but returned to the issue of whether the defendant had ever possessed a weapon while incarcerated at Somers. The defendant testified that he had never possessed any type of weapon while an inmate at Somers. The state then offered into evidence a disciplinary ticket charging the defendant with possession of a "shank" several months prior to the riot. His counsel objected, claiming that the ticket was not relevant. The trial court overruled the defendant's objection. The trial court admitted the ticket into evidence with a limiting instruction to the jury that the ticket was to be used only for impeachment purposes and not for the truth of the contents of the ticket.[19] The trial court also excised from the ticket the reference therein to the defendant's having assaulted a guard with the weapon.

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. *State* v. *Sinclair,* 197 Conn. 574, 579, 500 A.2d 539 (1985); *State* v. *Rothenberg,* 195 Conn. 253, 262, 487 A.2d 545 (1985); *State* v. *Braman,* 191 Conn. 670, 684–85, 469 A.2d 760 (1983)." *State* v. *Weinberg,* 215 Conn. 231, 246, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). "Our rules of practice make it clear that when an objec-

---

[19] There was a considerable amount of discussion during trial concerning whether the ticket had in fact been dismissed. The defendant, however, does not claim that the trial court improperly admitted the ticket because it had been dismissed, but only seeks review on the basis that the admission of the ticket constituted improper impeachment with extrinsic evidence as to a collateral matter or was thinly veiled propensity evidence.

tion to evidence is made, a succinct statement of the grounds forming the basis for the objection must be made in such form as counsel desires it to be preserved and included in the record." *State* v. *Braman,* supra, 684; see also Practice Book § 288.[20] "This court reviews rulings solely on the ground on which the party's objection is based." *State* v. *Manning,* 162 Conn. 112, 118, 291 A.2d 750 (1971). "In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. *State* v. *Addazio,* 169 Conn. 416, 427, 363 A.2d 153 (1975); *State* v. *Manning,* supra, 118–19; *State* v. *Gelinas,* 160 Conn. 366, 369, 279 A.2d 552 (1971); *Casalo* v. *Claro,* 147 Conn. 625, 628–29, 165 A.2d 153 (1960)." *State* v. *Braman,* supra. Moreover, articulating the basis of the objection "alert[s] the court to any claims of error while there is still an opportunity for correction. . . . *State* v. *Dennison,* 220 Conn. 652, 657, 600 A.2d 1343 (1991)." (Internal quotation marks omitted.) *State* v. *Paulino,* 223 Conn. 461, 476, 613 A.2d 720 (1992).

The defendant did not claim at trial that the admission of the disciplinary ticket was improper because it was extrinsic evidence offered to impeach the defendant on a collateral issue or because it constituted impermissible evidence of propensity to commit crimes. The defendant rather objected solely on the ground of relevancy. Consequently, neither the trial court nor the prosecution was alerted to the possibility that the defendant's objection was grounded on anything other than relevancy.[21] The state, therefore, did not have the

---

[20] Practice Book § 4185 also provides that the Supreme Court is not "bound to consider a claim unless it was distinctly raised at the trial . . . ."

[21] Propensity evidence is not excluded because it is irrelevant, but because its prejudicial effect outweighs its probative value. *State* v. *Sierra,* 213 Conn. 422, 436, 568 A.2d 448 (1990).

opportunity to address or the court the occasion to rule on other grounds. "Thus, to review the defendant's claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. (Internal quotation marks omitted.) *State* v. *Brice,* [186 Conn. 449, 457, 442 A.2d 906 (1982)], quoting *State* v. *DeGennaro,* 147 Conn. 296, 304, 160 A.2d 480, cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95 (1960)." *State* v. *Braman,* supra, 685.[22]

## VI

The defendant next claims that the trial court improperly instructed the jury on the essential elements of the crime of rioting in a correctional facility. The defendant specifically argues that the trial court's instruction enabled the jury to equate a conviction of assault on a correction officer with a conviction of rioting. The defendant argues that, although he did not preserve this claim at trial, he is entitled to prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), because the trial court allegedly violated his constitutional rights to be judged by an adequately instructed jury. We disagree.

The third count of the second substitute information charged that "with intent to cause physical injury to an employee of the Department of Corrections, [the defendant] caused a 6.5 centimeter laceration to the neck of Corrections Officer David Serkosky by slashing the victim with a homemade knife." The fourth count charged the defendant with rioting in a correctional institution in that as "an inmate at The Connect-

---

[22] The defendant also seeks to prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), claiming that the admission of the disciplinary ticket violated his right to a fair trial under the fourteenth amendment to the federal constitution and article first, § 8, of the Connecticut constitution. The defendant's claim is obviously evidentiary, and he cannot prevail under *Golding* because the claim is not of constitutional magnitude.

icut Correctional Institution at Somers, [he] incited, instigated, caused, aided, abetted, assisted and/or took part in a disorder, disturbance and/or riot in the East Mess Hall of the Institution by slashing the neck of Corrections Officer David Serkosky by means of a homemade knife and by exhorting other inmates to participate in the disturbance and/or assaults on correctional officers.''

The trial court instructed the jury on the offense of rioting by first reciting General Statutes § 53a-179b, the statute defining the offense. It then instructed the jury as to the definition of the term rioting as follows: ''[A] riot can be [a] group of people in threatening attitudes acting in concert with disorder and violence, people who are determined to accomplish some injury to a person or property in spite of any resistance which may be offered. The underlying element essential to constitute a riot involves consent of the lawless group accomplishing or bent on accomplishing some objective in such a violent and turbulent manner as to create a harm or consternation which alarms or is calculated to alarm or terrify people. Now the mere presence at a riot or disturbance of one who does not participate does not render him subject to prosecution under this statute.'' The trial court then charged that, ''the respective defendant must have been an active participant or participate in the conduct. The elements of this offense are that the defendant must incite or instigate or cause or aid or abet or assist or take part in a disorder, riot or disturbance at a correctional institution.'' The court instructed the jury that in order to find the defendant guilty of rioting, the state must prove beyond a reasonable doubt that ''the respective defendant participated in, assisted or took part in or instigated or incited or caused or aided or abetted a riot or a disturbance as I have explained it to you . . . and in the

case of Mr. Robinson that he participated in this disturbance or disorder or riot by slashing the neck of Corrections Officer Serkosky.''

The state subsequently informed the trial court that it thought the court had improperly instructed the jury that to find the defendant guilty of rioting, the jury must find that he had slashed Serkosky. The state asserted that, because the information had also charged the defendant with rioting on the additional basis that he exhorted other inmates to violence, the court should emphasize that basis. Ultimately, the court recharged the jury. "I told you that . . . the riot would have taken place by the slashing of the neck of Officer Serkosky by Mr. Robinson. It can also have taken place by, if you find the evidence warrants it, by Mr. Robinson exhorting other inmates to take part in the disturbance or assault on correction officer[s].''

Viewing the charge as a whole, we conclude that the trial court provided the jury with a "clear understanding of the issues presented for their consideration, under the offenses charged and upon the evidence . . . .'' *State* v. *Watlington,* 216 Conn. 188, 198–99, 579 A.2d 490 (1990). The trial court properly instructed the jury as to the statutory elements of the offense of rioting in a correctional institution. The jury, therefore, was aware that the state must prove beyond a reasonable doubt that a riot or disturbance had occurred and that the defendant had actively participated in that riot or disturbance. The jury was simply told that it could consider the testimony that the defendant had slashed the correction officer as some evidence that the defendant had actively participated in the riot. A single act may, under certain circumstances, violate elements of more than one criminal statute. *State* v. *Gilchrist,* 24 Conn. App. 624, 626–30, 591 A.2d 131, cert. denied, 219 Conn. 905, 593 A.2d 131 (1991). It is highly unlikely that the jury was misled by the charge to believe that

it could convict the defendant of rioting in a correctional institution simply by finding that he had assaulted the correction officer.

We conclude that the trial court's instructions were adequate to present to the jury the statutory elements that it had to find proven by the state in order to convict the defendant of rioting in a correctional institution. The defendant, therefore, cannot prevail on this unpreserved claim under the third prong of *Golding*.

## VII

The defendant next contends that the trial court improperly refused to disclose the contents of the personnel records of the correction officers who testified against him. He argues that without access to those files, he was denied his constitutional right to information with which to confront the witnesses against him guaranteed by the sixth amendment to the federal constitution and article first, § 8, of the Connecticut constitution.[23]

The facts relevant to this claim are as follows. Prior to trial, the defendant subpoenaed from the department of correction the personnel records of each of the correction officers who testified against him, namely, King, Serkosky, Conniff and Springer. The defendant specifically sought any references to past complaints made by any of the officers against the defendant that were recorded in the officers' personnel files. The trial court told the defendant that it would conduct an in camera review of the files and disclose any references therein to the defendant or to the incident. The defend-

---

[23] The sixth amendment to the United States constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

Article first, § 8, of the Connecticut constitution provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

ant did not object when the trial court stated that it intended to conduct an in camera review of the personnel files. After an in camera review, the trial court released to the defendant the information in the files that it determined to be relevant, specifically references to the incident of April 19, 1990, and Serkosky's injuries.

The defendant did not preserve his constitutional claim at trial. On appeal, he seeks to prevail under *Golding*. His claim is conditioned, however, on this court reviewing the records that were the subject of the trial court's in camera examination and discovering information that the trial court should have given to him at trial. He contends that, if we find such information, we must conclude that his constitutional rights were violated. Our review of the personnel files in question reveals that the trial court did not abuse its discretion by withholding any information in those files. *State* v. *Januszewski*, 182 Conn. 142, 171, 172–73, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). This claim of the defendant is without merit.

## VIII

The defendant next claims that the trial court improperly allowed prejudicial closing arguments by the codefendant and the state. The defendant focuses on remarks made by the codefendant's counsel that contrasted the evidence against his client with the evidence against the defendant and on remarks made by the state referring to evidence not admitted at trial and to witnesses who were not called to testify. The defendant argues that as a consequence of the harm caused by these closing arguments, his constitutional due process right to a fair trial was violated.

We have reviewed this claim of the defendant and find it to be without merit. The defendant, at trial,

raised no objection to the closing remarks of either the codefendant's counsel or the state's attorney. Therefore, he presumably did not regard their remarks as seriously prejudicial at the time they were made. *State v. Negron,* 221 Conn. 315, 330, 603 A.2d 1138 (1992). Moreover, in addressing the jury, "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State v. Richardson,* 214 Conn. 752, 760, 574 A.2d 182 (1990). Also, the state may properly respond to inferences raised by the defendant's closing argument. *State v. Fullwood,* 194 Conn 573, 585, 484 A.2d 435 (1984). Furthermore, we must review the comments complained of in the context of the entire trial. *State v. Williams,* 204 Conn. 523, 538, 529 A.2d 653 (1987); *State v. Glenn,* 194 Conn. 483, 492, 481 A.2d 741 (1984). In that context, the burden is on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted. *State v. Doehrer,* 200 Conn. 642, 653–54, 513 A.2d 58 (1986); *State v. Glenn,* supra. This the defendant has failed to do.

We conclude that the defendant was not clearly deprived of his constitutional right to due process by the closing remarks of either the codefendant's counsel or the state, and consequently he cannot prevail on this unpreserved claim. *State v. Golding,* supra, 240.

IX

The defendant finally claims that judgment of the trial court should be reversed and a new trial ordered because of the cumulative effect of the improprieties he has alleged. We disagree.

The defendant in *State* v. *Tillman,* 220 Conn. 487, 600 A.2d 738 (1991), cert. denied, U.S. , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992), made a similar claim. He argued that a group of instructional claims of error, none of which individually constituted error, "should be aggregated to form a separate basis for a claim of a constitutional violation of a right to a fair trial." Id., 505. We rejected the defendant's claim in *Tillman,* and we reject the defendant's analogous claim in this case. "We decline to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts." Id.

The judgment is affirmed.

In this opinion PETERS, C. J., BORDEN and SAN-TANIELLO, Js., concurred.

BERDON, J., concurring in the result. Although I concur in the result, I write separately on the jury array issue to express my concerns about the majority's analysis. I want to clarify, however, that my silence on the remaining issues should not be interpreted as acceptance of the majority's analysis or reasoning on those issues.

I agree with the defendant that under the state constitutional right to trial by jury, an accused need only prove the first two prongs of *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), in order to establish a prima facie violation of his right to have a jury drawn from a representative cross section of the community. The first two prongs of *Duren* require the defendant to show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; [and] (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." Id.

In view of the defendant's right to "trial by an impartial jury"; Conn. Const., art. I, § 8; the defendant need not prove the third prong of *Duren* v. *Missouri,* supra, namely, "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." To require such proof would contradict the well established principle that "[a]n essential element of this right to trial by an impartial jury is that the venire be composed of a representative cross section of the community. *State* v. *Nims,* 180 Conn. 589, 594–95, 450 A.2d 1306 (1980). In *Smith* v. *Texas,* 311 U.S. 128, 130, 615 S. Ct. 164, 85 L. Ed. 84 (1940), Justice Black, writing for a unanimous court, stated the following: 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' . . . 'The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community.' *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181 (1946) (Frankfurter, J., dissenting)." *Williams* v. *Coppola,* 41 Conn. Sup. 48, 54, 549 A.2d 1092 (1986).

"Although this representative cross section of the community standard was not articulated in the early common law, fairness and integrity in the selection process were always the touchstone. 'It being indispensable to the pure administration of justice, in trials by jury, that the jurors should be selected with the utmost fairness and integrity, courts have always deemed it a good cause of challenge to them, that the officer returning them was interested, or guilty of any par-

tiality or misconduct, in their selection; and so careful and jealous are they on this subject, that the objection on this ground goes, not only to the particular jurors returned under the influence of such improper motives or conduct, but extends to the whole panel and is a cause of challenge to the array.' *Quinebaug Bank* v. *Tarbox,* 20 Conn. 510, 516–17 (1850)." *Williams* v. *Coppola,* supra, 55.

It is clear that the defendant established the first criteria—namely, that the group allegedly excluded, African Americans in this case, is distinct. I do not believe, however, that the record is sufficient to satisfy the second prong of the *Duren* test because it does not indicate the number of African Americans in the venire or array—that is, the pool of jurors from which the individual panels are selected.

We do know that the panels sent to the voir dire for the defendant's trial did not contain any African Americans. Nevertheless, it is the venire "from which [the] panels are drawn [that] must be composed of a representative cross-section of the community in order to allow the defendant a chance to achieve this result." *State* v. *Tillman,* 220 Conn. 487, 510, 600 A.2d 738 (1991), cert. denied,    U.S.   , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992) (*Berdon, J.,* dissenting).

In addition, I feel compelled to comment on the majority's adherence to the substantial impact test as the appropriate statistical model for analyzing substantial underrepresentation claims when the distinctive group's size in the community is proportionally small, as in this case. The substantial impact test is not a fair guide when based upon a county population census that has few members of the distinctive group. This case demonstrates the folly of using this test in a county such as Tolland, because only 2 percent of the population in that county is African American. Accordingly,

a venire of 200 persons with no African Americans would not satisfy the significant impact test because presumptively only four would be required. See *State v. Castonguay,* 194 Conn. 416, 481 A.2d 56 (1984).

Although this case is not the vehicle for changing the rule, we should consider other statistical models.[1] Indeed, in view of the liberal rules governing change of venue,[2] we may wish to consider the "community" to be the entire state, in which the African American population is significantly greater than 2 percent.

"In order for the public to have confidence in our criminal justice system, it is important not only that we do justice but also that all racial and ethnic segments of our population perceive that justice is done. 'In our system of justice, not only must the accused be afforded a fair trial, but equally important there must be a perception of fairness by the community and the accused. Anything less not only undermines the credibility of this branch of government but also threatens the very fabric of our democracy.' *State* v. *Tillman,* [supra, 514–15]. Indeed, almost forty years ago Justice Frankfurter wrote that 'justice must satisfy the appearance of justice.' *Offutt* v. *United States,* 348 U.S. 11, 14, 75 S. Ct. 11, 99 L. Ed. 11 (1954). And although the practice and perception of justice involve a variety of levels

[1] Although I do not agree with his conclusions on the merits of each method, Justice Parskey discussed other tests for evaluating a fair cross section claim in *State* v. *Castonguay,* 194 Conn. 416, 481 A.2d 56 (1984). Moreover, although the majority relies on *Castonguay* to support its adherence to the substantial impact test, the decision in *Castonguay* is distinguishable from the present case because it involved a due process challenge to the selection of grand jurors. This case, however, involves the right to "trial by an impartial jury" under the state constitution.

[2] Practice Book § 835 provides: "Upon motion of the prosecuting authority or the defendant, or upon his own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending; or (2) If the defendant and the prosecuting authority consent."

of government—the police officer, the state's attorney and the trial judge—to a great extent this court determines for our state residents how rich or thin that justice and perception of justice will be viewed." *State* v. *Roman,* 224 Conn. 63, 80–81, 616 A.2d 266 (1992) (*Berdon, J.,* dissenting), cert. denied,    U.S.   , 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993).