******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LORENE TATE *v.* SAFECO INSURANCE COMPANY
OF ILLINOIS ET AL.
(AC 36279)

DiPentima, C. J., and Alvord and Pellegrino, Js.

*Argued February 10—officially released May 26, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Sommer, J.)

*James O. Gaston*, for the appellant (plaintiff).

*Christopher M. Russo*, for the appellee (named
defendant).

*Michael T. Vitali*, for the appellee (defendant Marjo-
rie Meketa).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Lorene Tate, appeals from the judgment of the trial court, rendered after a jury trial, following the denial of her motion to set aside the verdict and for a new trial. On appeal, the plaintiff claims that the court erred in limiting her expert witness physician from referring to records in evidence compiled by other medical providers while allowing the expert witnesses called by the defendants, Safeco Insurance Company of Illinois (Safeco)[1] and Marjorie Meketa, to reference them in their testimony. Additionally, the plaintiff argues that the court's "cumulative erroneous rulings, obstruction and interference with the plaintiff's presentation of her case, and perceived bias at trial unduly prejudiced the plaintiff, rose to the level of harmful error, and prevented her from securing a fair trial." We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the appeal. On June 19, 2009, the plaintiff's automobile was involved in a low-speed collision with the Meketa vehicle on Islandbrook Avenue in Bridgeport. Following the impact, the Meketa vehicle attempted to leave the scene, and the plaintiff pursued it until she was able to obtain the license plate number of the Meketa vehicle. Once she had secured the license plate number, the plaintiff terminated her pursuit, drove home, and called the police.

The responding police officer, Brian Spillane, determined that the license plate number provided to him by the plaintiff belonged to a vehicle owned by Meketa. Spillane examined the plaintiff's automobile and observed that it had sustained damage to its left side. When the Meketa vehicle subsequently was examined by Officer Samuel McKelvie on June 22, 2009, however, he could not observe anything "out of the ordinary," besides "regular . . . scratches and scrapes . . . ."

The plaintiff informed Spillane that she had sustained an injury as a result of the accident. Specifically, according to Spillane, the plaintiff complained of back pain, but her injury was "non-evident."[2] When Spillane asked the plaintiff whether she wanted him to call an ambulance, the plaintiff refused and told Spillane that she would drive to the emergency room herself because it was "just down the street." At the Bridgeport Hospital emergency room, the plaintiff complained of having mild pain in her lower back and on the right side of her neck, radiating down the right arm. The hospital record further reflects that the plaintiff was observed limping at the time of the visit but does not reflect any complaint about her knee.

As the day progressed, however, the plaintiff's condition did not improve, and she decided to seek additional help. Acting on her friend's advice, the plaintiff set up an

appointment with Anthony Tortorella, a chiropractor, who agreed to see her the next day, June 20, 2009. During the appointment, Tortorella performed a series of tests and diagnosed the plaintiff with having "[c]ervical radiculitis with associated cervical sprain strain, acute moderate wrist pain, [right] knee pain, and dysesthesia."[3] On the basis of the diagnosis, Tortorella prescribed a course of treatment for the plaintiff starting June 24, 2009.[4] On July 24, 2009, Tortorella referred the plaintiff to Daniel Sheehan, a pain management physician, for additional testing. The plaintiff, however, did not schedule an appointment with Sheehan until September 18, 2009.

Having performed the additional testing, Sheehan recommended that the plaintiff continue taking ibuprofen for pain management and prescribed Flector Patches for the knee and neck/shoulder area.[5] Sheehan also ordered a Magnetic Resonance Imaging (MRI) of the cervical spine.[6] At the follow up appointments on October 9, and November 6, 2009, Sheehan recommended that the plaintiff continue taking ibuprofen, and applying Flector Patches. In addition, because the plaintiff continued to complain about her knee, Sheehan prescribed a knee sleeve with a patellar cut-out. On December 23, 2009, Sheehan ordered a MRI of the knee because the plaintiff continued to experience pain in that area. The MRI revealed "evidence of meniscal tear of the posterior horn of the lateral meniscus, medial meniscal tear at the posterior horn and chondromalacia patella with fraying of the patellar articular cartilage."[7] On the basis of his reading of the MRI, Sheehan referred the plaintiff to Edward Staub, an orthopedic surgeon.

Upon the initial examination of the plaintiff, Staub recommended that she undergo arthroscopic knee surgery. That surgery took place on January 26, 2010. During the surgery, Staub observed an "irregularity of the anterior cruciate ligament, suggesting a partial tear," and "a tear of the lateral meniscus and also moderate chondromalacia patella, among other findings." On the basis of these findings, Staub rated the plaintiff as having a 20 percent permanent partial disability. Following the surgery, the plaintiff initially recovered well, however, in November, 2011, she experienced a recurrence of the knee pain, which was treated by a cortisone injection. Despite the cortisone injection, she continued to complain of discomfort in her knee.

The plaintiff instituted the present action on June 14, 2010, naming Safeco and Meketa as defendants. In her amended complaint dated August 31, 2010, the plaintiff alleged that, as a result of the accident, she had sustained serious personal injuries to her cervical spine and right knee, including "a tear to the lateral meniscus of the right knee; tear of the anterior [cruciate] ligament of the right knee; chondromalacia, lateral femoral condyle and medial facet of the patella . . . and . . .

patellofemoral dysfunction" to which surgical intervention was necessitated.[8]

At trial, the extent and origin of the plaintiff's right knee injuries were vigorously contested by the parties. To support the allegations that her knee was injured in the accident, the plaintiff presented the testimony of Tortorella and Staub, and introduced the medical records of Sheehan, which were admitted into evidence as full exhibits by the court. Both Tortorella and Staub testified that the accident was the likely cause of the plaintiff's knee injury. Even though Sheehan did not testify at trial, his records indicated that the plaintiff sustained her knee injury as a result of the accident.

To dispute the plaintiff's claims, the defendants presented the testimony of two orthopedic surgeons: Dennis Ogiela and Herbert Hermele. Neither Ogiela nor Hermele had examined the plaintiff. Instead, both witnesses based their conclusions on their review of the medical records of Tortorella, Sheehan and Staub, the emergency room records, and the MRI results.

In his testimony, Ogiela agreed that the plaintiff had sustained permanent injuries as a result of the accident. He did not agree, however, with the permanent partial disability ratings assigned by Sheehan as to the cervical injury, nor by Staub as to the knee injury. According to Ogiela, the plaintiff's cervical injury only warranted a permanent disability rating of 3 to 5 percent instead of the 8 to 9 percent assigned by Sheehan, and her knee injury warranted only a 5 to 7 percent rating instead of the 20 percent assigned by Staub. Ogiela specifically disagreed with Staub's 20 percent rating because chondromalacia and tears of meniscus "can occur from age related wear and tear change and just normal mechanical force on the joint. And you can't really look at that MRI scan and say all of those things occurred . . . on the date of that accident." To further substantiate his argument for a lower knee rating, Ogiela pointed out that the emergency room records from the date of the accident had no specific reference to the knee injury, indicating instead that, upon examination, the plaintiff's extremities were noted as being normal, and that the records from subsequent examinations by Tortorella and Sheehan had not detected effusion, excess fluid in the joint, or any sign of laxity of the cruciate ligament indicating that there had been a partial or a complete tear.

Hermele also opined that it was not likely that the plaintiff had sustained all of her knee injuries in the accident. Hermele testified that he arrived at this conclusion because "this was a low velocity motor vehicle accident, that when [the plaintiff] presented to the emergency room the focus was her back. There was no mention made of knee pain. She was seen by more than one person in the emergency room that's a triage nurse, treating nurse, treating physician. Nobody men-

tioned any knee pain." According to Hermele, an injury involving an anterior cruciate ligament and an acute meniscus tear is not a minor sort of injury, but an injury from which "patients hurt a great deal and they mention this." Hermele further testified that he believed that the plaintiff probably had a contusion of her right knee as a result of the accident, but that other findings made by Staub during the surgery were more likely than not preexisting. In conclusion, Hermele testified that a medical probability of the plaintiff sustaining a tear of the meniscus as a result of a low-speed accident was "much less" than one percent.

Upon the conclusion of the case, the jury returned a plaintiff's verdict. The plaintiff was awarded $7,607.54 in economic damages and $7,607.54 in non-economic damages. The accompanying jury interrogatories indicated that the jury compensated the plaintiff in full for her expenses at the Bridgeport Hospital emergency room, MRI imaging, and services provided by Tortorella and Sheehan. The interrogatories, however, specified that the jury declined to compensate the plaintiff for any expenses she had incurred in connection with Staub's treatment and the knee surgery. On March 20, 2013, the plaintiff filed a motion to set aside the jury verdict and for a new trial. On October 15, 2013, the court denied the motion and rendered judgment for the plaintiff. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court erred in limiting Staub from referring to Sheehan's records while allowing the defendants' expert witnesses to reference them in their testimony. Specifically, the plaintiff argues that the court's ruling "was not only erroneous, but harmful error as it completely tied the hands of the [p]laintiff and precluded her from introducing highly relevant evidence to support the diagnoses, treatment and causation of the right knee injury." Having reviewed the record, we conclude that the alleged error, if any, was harmless.

The following additional facts are relevant to our discussion. During Staub's testimony the following colloquy took place among the court, Safeco's counsel, and the plaintiff's counsel:

"[The Plaintiff's Counsel]: Doctor, we talked about—we talked about the hospital visit, we talked about Doctor Tortorella's treatment and care, and you also have records of doctor—Doctor Sheehan, correct?

"[Staub]: Correct.

"[The Plaintiff's Counsel]: All right. And you've reviewed the records of Doctor Sheehan?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: All right. And are the

records of Doctor Sheehan—well, first of all, Doctor Sheehan notes knee injury as well, correct?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And just for the record, you're talking about plaintiff's exhibit 18. And Doctor Sheehan indicates in his—in plaintiff's exhibit 18 his September 18, 2009 note, bilateral knee pain, which is more severe on the right. Is that consistent with your findings and diagnosis as to the right knee injury?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And on Doctor Sheehan's October 9, 2009 report, he notes right anterior knee pain—

"[Safeco's counsel]: Objection, Your Honor, those are Doctor Sheehan's records not Doctor Staub's.

"[The Court]: That is correct.

"[The Plaintiff's Counsel]: And these are full exhibits, Your Honor.

"[The Court]: And the doctor may be asked a question but the process that is being followed right now, Doctor Sheehan is not here. So the objection is sustained. You may ask a question of Doctor Staub, who is here to testify.

"[The Plaintiff's Counsel]: Right. And I'm asking him about Doctor Sheehan's—

"[The Court]: And you may ask the questions. You may ask questions.

"[The Plaintiff's Counsel]: Looking at Doctor Sheehan's report, which you have as part of your file of October 9, 2009, do you have that?

"[Staub]: Yes, I do.

"[The Plaintiff's Counsel]: And it's part of a—

"[Staub]: It's part of my file.

"[The Plaintiff's Counsel]: All right. And his assessment with respect to number—number 2, right anterior knee pain due to traumatic on side of right knee patella femoral dysfunction, is that consistent with your findings?

"[Safeco's counsel]: Objection, Your Honor. It's . . . Doctor Sheehan's conclusions they're not Doctor Staub's.

"[The Plaintiff's Counsel]: I'm asking Doctor Staub whether that's consistent with his diagnosis and his findings.

"[The Court]: Doctor Sheehan's records are admissible and Doctor Staub may testify as to his examination, his findings, and his conclusions as well as any treatment that he provided to the plaintiff. But to have Doc-

tor Staub interpret Doctor Sheehan's records is not admissible.

"[The Plaintiff's Counsel]: Doctor, is it common practice to review medical records of other doctors in treating a patient?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And, in fact, is it—independent medical exam—do doctors do that?

"[Staub]: All the time.

"[The Plaintiff's Counsel]: And in this case you had Doctor Sheehan's medical records provided to you, correct?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And you reviewed those, correct?

"[Safeco's counsel]: Leading, Your Honor.

"[The Court]: Sustained.

"[The Plaintiff's Counsel]: Were—and were those—were those of assistance to you?

"[Staub]: Of Course.

"[Safeco's counsel]: Leading, Your Honor.

"[The Plaintiff's Counsel]: That's not a leading question. Were they of assistance?

"[The Court]: Excuse me. I didn't ask for—the objections are sustained. You may proceed.

\* \* \*

"[The Plaintiff's Counsel]: And, doctor—and, doctor, what was the—was there any mention—was there any mention in the October 9, 2009 medical report of Doctor Sheehan?

"[Staub]: Are you asking if—in my—in my medical report?

"[The Plaintiff's Counsel]: No. No. In the—

"[Staub]: If I mentioned Doctor Sheehan?

"[The Plaintiff's Counsel]: In the October 9, 2009 report of Doctor Sheehan, did he—did he reference the right knee?

"[Staub]: Are you asking me this report that I have in my hand? I don't see a date on it. Date of visits 9-19 is that—it wasn't—

"[The Plaintiff's Counsel]: That was the first one.

"[Staub]: Oh.

"[The Plaintiff's Counsel]: Hold on. Let me just see this really quick. October—

"[Staub]: Would you repeat the question?

"[The Plaintiff's Counsel]: Sure. Looking at—looking at the October 9, 2009 medical record of Doctor Sheehan which is marked plaintiff's exhibit 18, is there mention of the right knee in that report?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And is the mention of the right knee in that report right knee range of motion testing reproduces anterior knee pain. Is that consistent with your diagnosis and findings?

"[Staub]: It was, yes.

"[The Plaintiff's Counsel ]: All right. It also says with light palpation she has tenderness of the anterior, again, to that right knee area, is that consistent with your findings and diagnosis?

"[Safeco's counsel]: Objection, Your Honor. Again, he's commenting on an examination by a different doctor that he didn't do.

"[The Plaintiff's Counsel]: He's allowed to—

"[The Court]: I'm going to overrule the objection. You can address that on cross-examination.

"[Safeco's counsel]: Thank you, Your Honor.

"[The Court]: Even though, technically—well, you may proceed. The objection is overruled.

"[The Plaintiff's Counsel]: Thank you. . . . And if we—if we look at the [November 6, 2009] report of Doctor Sheehan also marked plaintiff's exhibit 18, where it says flexure and extension of right knee or reproduced anterior and lateral knee pain, is that also consistent with your diagnosis?

"[Staub]: Yes.

"[The Plaintiff's Counsel]: And, doctor, based—based on reasonable medical probability, could you tell us what was the diagnosis with respect to the injuries that [the plaintiff] had—[the plaintiff] had from the motor vehicle incident of June 19, 2009?

"[Staub]: I think the twisting injury of her knee caused the acute tear of the lateral meniscus. The direct impact of the knee against the console caused damage to the articular surface of the patella and chondromalacia of the patella, which I would call traumatic chondromalacia of the patella. And the combination of the compression in the direct hit compression to the knee and the twist, in my opinion, caused at least a partial tear of the anterior cruciate ligament and probably damage to the remaining ligament because it did not look healthy. And there was no previous history of trauma to the knee or injuries or reason for this.

"[The Plaintiff's Counsel]: All right. And based on reasonable medical probability, could you tell us, again, what was your permanent partial disability rating

with—

"[Staub]: I recommended a total 20 [percent]. [Five percent] because of the meniscus tear and the need to remove probably 30 [percent] of the lateral meniscus. Damage to the lateral femoral—well, to the patella surface chondromalacia, which was what I called grade 3, fairly extensive. And an abnormal appearing and partially torn anterior cruciate ligament, which I recommended 10 [percent].

"[The Plaintiff's Counsel]: All right.

"[Staub]: And I recommended 5 [percent] to the chondromalacia. So that all adds up to 20 [percent] of the permanent impairment of the right knee.

"[The Plaintiff's Counsel]: All right. Thank you, doctor."

Following Staub's testimony, the plaintiff filed a motion to preclude the testimony of the defendants' two expert witnesses. In her motion, the plaintiff argued that the defendants' experts should be precluded from testifying because their testimony "is based on medical records of other physicians and the previous ruling of the [c]ourt . . . is that physicians are not allowed to testify based on other physicians' findings, opinions, reports, records, or notes." After hearing argument from both sides, the court denied the plaintiff's motion.

With this background in mind, we set forth the governing legal principles. "Our review of claims of evidentiary impropriety [is] governed by well established principles. This court will set aside an evidentiary ruling only when there has been a clear abuse of discretion." (Internal quotation marks omitted.) *Terio* v. *Rama*, 104 Conn. App. 35, 39, 930 A.2d 837 (2007), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008). Even when a court's evidentiary ruling is deemed to have been improper, "we [still] must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . [T]he standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely] would [have] affect[ed] the result. . . . When making such a determination, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Citations omitted; internal quotation marks omitted.) Id., 43.

On appeal, the plaintiff claims that the ruling of the court limiting Staub, but not Hermele or Ogiela, to testimony regarding "*his* examination, *his* findings, and *his* conclusions as well as any treatment he provided to the [p]laintiff" and not allowing him to reference records and reports of other physicians is harmful error.

(Emphasis in original; internal quotation marks omitted.) Specifically, the plaintiff argues that the while Hermele and Ogiela "were freely permitted to testify about all the medical records and reports, and focus on alleged inconsistencies and absence of anticipated objective and subjective findings, the [p]laintiff was barred from explaining and opining as to the consistencies and importance of findings in said records and reports, particularly of Dr. Sheehan." We are not persuaded.

For purposes of this appeal, we assume, without deciding, that the court's ruling prohibiting Staub from using Sheehan's reports was erroneous. Nevertheless, having reviewed the record before us, we conclude that the plaintiff failed to meet her burden of demonstrating that the alleged error was harmful.

The jury's decision not to compensate the plaintiff for any expenses associated with her knee surgery makes it clear that it did not believe the plaintiff's testimony that her knee required surgery *as a result* of the accident. Thus, we must determine whether, absent the court's adverse evidentiary ruling, Staub's testimony likely would have affected the final result. For the following reasons, we answer this question in the negative.

First, Sheehan's records themselves, as full exhibits, were available to the jury. Thus the jury had the opportunity fully to examine, consider, and refer to Sheehan's findings and assessments during its deliberations. In fact, in closing argument, the plaintiff's counsel specifically reminded the jury that Sheehan's records were available for their review. An indication that the jury did consider Sheehan's records can also be inferred from the fact that it explicitly compensated the plaintiff for all expenses that she had incurred as a result of being treated by Sheehan. Furthermore, during the questioning of Tortorella, the plaintiff solicited and obtained an explanation of the nerve conduction test that had been performed by Sheehan in connection with the plaintiff's cervical injury. In addition, during her own testimony, the plaintiff thoroughly described her course of treatment with Sheehan, including tests performed, problem areas identified, and medical solutions prescribed or suggested by him. Significantly, even during Staub's testimony, the plaintiff was able to confirm that Sheehan's findings that certain tests "reproduced" the plaintiff's right knee anterior and lateral knee pain and that the plaintiff had tenderness of the anterior were consistent with Staub's findings and diagnosis. Thus, the jury was informed adequately about and had full access to Sheehan's records both during the trial and during its deliberations. On the basis of our review of the record, we thus conclude that the court's evidentiary ruling did not prevent the jury from considering the relevant and material evidence contained in Sheehan's records.

Second, as we have stated previously in this opinion, the central issue in the case was whether the plaintiff's knee required surgery *as a result* of the accident, and not whether she in fact needed the knee surgery. The expert witnesses for both the plaintiff and the defendants did not disagree that the knee surgery was reasonable. The point of contention between the defendants and the plaintiff was whether the low-speed accident could have caused the injuries requiring the surgery or whether the plaintiff's knee problems existed prior to the accident. Therefore, to support the plaintiff's theory of the case—i.e., that the accident had caused the knee injury—Sheehan's records must contain some *explanation* as to how the accident had caused the knee injury that Staub could have pointed to in support of his own conclusion. Our review of Sheehan's records reveals no such explanation.

Sheehan's records consist of five separate summaries of the plaintiff's visits with him. The summaries neither contain any discussion of how the accident had caused the plaintiff's knee injury, nor do they explain why Sheehan believed that the knee injury was caused by the accident. Only the summary from the January 22, 2010 visit contains Sheehan's conclusion that as "a result of trauma sustained in a motor vehicle collision on June 19, 2009, [the plaintiff] has . . . [r]ight knee pain due to medial and lateral meniscal tears with traumatic onset of patellar chondromalacia." It is clear, of course, that such a conclusory statement does not constitute the type of evidence that an expert witness could have used to support his opinion. See, e.g., *Wallace* v. *St. Francis Hospital & Medical Center*, 44 Conn. App. 257, 261–62, 688 A.2d 352 (1997) (concluding that where no evidence had been presented as to source or cause of decedent's internal bleeding, any opinion as to cause of death would necessarily have been speculative).

Moreover, the summary of the plaintiff's first visit on September 18, 2009, indicates that Sheehan was under the impression that the plaintiff's accident had been a rear-end collision, while, in fact, the plaintiff's car had been hit in the area of the left rear wheel. As the plaintiff aptly pointed out during cross-examination of Ogiela, however, "a rear-end accident as opposed to a side impact accident . . . presents a different mechanical feature with respect to what happens to a person in the car . . . ." Given this apparent misunderstanding of the accident mechanics, it is clear that no one, besides Sheehan himself, could have testified and explained with any degree of credibility why the plaintiff's injuries were caused by the accident, and exactly how they might have occurred. We are, thus, convinced that Sheehan's records could not have offered support to Staub's conclusion that the accident had been the cause of the plaintiff's knee injury.

Consequently, having reviewed the record, we con-

clude that the plaintiff failed to meet her burden of demonstrating that the alleged error by the court in precluding Staub from referring to Sheehan's records was harmful. Therefore the plaintiff's claim fails.

## II

The plaintiff next claims that the court's "cumulative erroneous rulings, obstruction and interference with the plaintiff's presentation of her case, and perceived bias at trial unduly prejudiced the plaintiff, rose to the level of harmful error, and prevented her from securing a fair trial."[9] We are not persuaded.

Because the plaintiff's claim really raises two distinct issues, namely, whether "cumulative erroneous rulings" of the court were so harmful that they prevented her from having a fair trial and whether the court exhibited bias against the plaintiff, we address each separately.

## A

First, the plaintiff claims that the court made "so many erroneous rulings against [her] that their cumulative nature arises to harmful error." To support this proposition, however, the plaintiff cites to no legal principle or authority. We have consistently held that "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 826, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025,126 S. Ct. 1578,164 L. Ed. 2d 309 (2006). "Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion *or citation of authorities*, it is deemed to be abandoned." (Emphasis added; internal quotation marks omitted.) *Kelib* v. *Connecticut Housing Finance Authority*, 100 Conn. App. 351, 353, 918 A.2d 288 (2007).

In her brief, the plaintiff spends a great deal of time highlighting the alleged erroneous court rulings, but provides no meaningful legal analysis to support her proposition that these alleged errors, *when assessed cumulatively*, amounted to harmful error.[10] We thus conclude that without this analysis the plaintiff's brief is inadequate for appellate review, and we decline to review it.[11]

## B

Second, the plaintiff argues that "the observed lack of [im]partiality by the [c]ourt" amounted to judicial bias.[12] Having reviewed the procedural posture of the case, we conclude that the plaintiff's claim of judicial bias was not properly preserved because she failed to move to disqualify the judge at any time during the trial court proceedings in accordance with Practice Book § 1-23.[13] See *Lynch* v. *Lynch*, 153 Conn. App. 208, 248,

100 A.3d 968, (2014), cert. denied, 315 Conn. 923, A.3d (2015). "Claims alleging judicial bias should be raised at trial by a motion for disqualification or the claim will be deemed to be waived. . . . A party's failure to raise a claim of disqualification at trial has been characterized as the functional equivalent of consenting to the judge's presence at trial." (Internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 316, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). "Our Supreme Court has criticized the practice whereby an attorney, cognizant of circumstances giving rise to an objection before or during trial, waits until after an unfavorable judgment to raise the issue. We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted.) Id. Moreover, "[t]he fact that a trial court rules adversely to a litigant, even if some of these rulings were to be determined on appeal to have been erroneous, does not demonstrate personal bias." *Bieluch* v. *Bieluch*, 199 Conn 550, 553, 509 A.2d 8 (1986).

While it is true that because "an accusation of judicial bias or prejudice strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary . . . we . . . [previously] have reviewed unpreserved claims of judicial bias under the plain error doctrine [when specifically raised on appeal]." (Internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, supra,120 Conn. App. 317. We have nevertheless declined to review claims of alleged judicial bias if no claim of plain error was made by a party on appeal. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 162 n.33, 84 A.3d 840 (2014) (reviewing court is not required to "raise an issue implicating plain error . . . sua sponte if a party itself has failed to do so"); *State* v. *Moore*, 65 Conn. App. 717, 728, 783 A.2d 1100, (declining review where no plain error claim was made), cert. denied, 258 Conn. 940, 786 A.2d 427 (2001). In this case, the plaintiff does not ask for a plain error review, and, thus, we decline to review her claim of judicial bias.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff named Safeco as a defendant because, as her automobile insurance provider, Safeco provided coverage for underinsured motorist claims.

[2] During his testimony, Spillane explained that a non-evident injury is if "someone tells they're injured but it's something I can't see . . . ."

[3] Dysesthesia is defined as "[a]bnormal sensations experienced in the absence of stimulation." Stedman's Medical Dictionary (28th Ed. 2006).

[4] The treatment initially was prescribed for three times a week and then it was reduced to twice a week with the final treatment occurring on March 5, 2010.

[5] The Flector Patch is "a topical pain medication delivered by a transdermal patch . . . for the treatment of acute pain due to minor strains, sprains,

and contusions." (Internal quotation marks omitted.) *U.S. ex rel. Palmieri* v. *Alpharma, Inc.*, 928 F. Supp. 2d 840, 842 (D. Md. 2013).

[6] The MRI revealed that the plaintiff had a small central disc protrusion at C6-7. On the basis of his findings, Sheehan rated the plaintiff as qualifying for 8 to 9 percent impairment of the whole person. Sheehan explicitly declined to assign an impairment rating with respect to the right knee.

[7] Chondromalacia is defined as a "[s]oftening of any cartilage." Stedman's Medical Dictionary (28th Ed. 2006).

[8] A condyle is defined as "a rounded articular surface at the extremity of a bone." Stedman's Medical Dictionary (28th Ed. 2006).

[9] In particular, the plaintiff contents that the court erroneously sustained several objections during her opening statement, did not allow her to publish or read the police report to the jury, precluded her from reading or publishing the medical reports to the jury, and precluded her from questioning Hermele during cross-examination about his understanding of the mechanics of the accident.

[10] We note that while our research revealed no legal authority on the subject in the context of civil litigation, our criminal jurisprudence on the subject of constitutional cumulative error, however, is settled. Connecticut courts have repeatedly declined "to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 747, 631 A.2d 288 (1993); see also *Henderson* v. *Commissioner of Correction*, 104 Conn. App. 557, 567, 935 A.2d 162 (2007), cert. denied, 285 Conn. 911, 943 A.2d 470 (2008). Even though the cited cases are not directly on point because they involved constitutional cumulative error claims in criminal proceedings, the underlying logic carries over into the civil context.

[11] We further note that, with the exception of the claim discussed in part I of this opinion, the plaintiff does not argue that any other alleged erroneous court ruling by itself was so harmful as to warrant a new trial.

[12] While our thorough review of the trial transcript reveals that it was a highly contested and emotionally charged case, we uncovered no evidence that would make us question the court's impartiality.

[13] Practice Book § 1-23 provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."